STATE *vs.* CONSTANTINE KOFINES et al.

JULY 7, 1911.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland. JJ.

(1) *Statutes.   Constitutional Law.*

Statutes should be sustained unless their unconstitutionality is clear beyond a reasonable doubt.   A reasonable doubt is to be resolved in favor of the legislative action and the act sustained.

(2) *Lobster Fishery.   Constitutional Law.*

Pub. Laws, cap. 437, acts of 1909, "for the better protection of the lobster fisheries" relates not merely to a business affected with a public use and interest, but to the public use and interest itself.   It is clearly within the police power of the state and the power of the legislature is not abridged by the provisions of Cons. R. I. Art. I, sec. 17, "The people shall continue to enjoy and freely exercise all the rights of fishery and the privileges of the shore to which they have been heretofore entitled, under the charter and usages of this state," etc.

(3) *Lobster Fishery.   Animals Ferae Naturae.   Police Power.*

Lobsters being animals *ferae naturae*, the right to reduce them to possession is subject to the control of the state.   This attribute of government which was recognized by the common law of England was vested in the colonial governments where not denied by their charters, or in conflict with grants of the royal prerogative.   This power possessed by the colonies passed to the states and remains with them in so far as its exercise may be not incompatible with or restrained by the rights conveyed to the federal government by the constitution.

The state may preserve by adequate police regulations a food supply, which belongs in common to all the people of the state, and which can only become the subject of ownership in a qualified way, and which can never be the object of commerce except with the consent of the state and subject to the conditions which it may deem best to impose for the public good.

(4) *Lobster Fishery.   Police Power.*

The mode and method of the regulation of the lobster fishery is a matter solely for the consideration of the legislature and their action is not subject to review except upon constitutional grounds.

(5) *Lobster Fishery.   Constitutional Law.*

Pub. Laws, cap. 437, acts of 1909 "for the better protection of the lobster fisheries" is not obnoxious to the provisions of Cons. R. I. Art. I, sec. 10, "   .   .   .   nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or the law of the land."

Nor is it obnoxious to the provisions of Art. 14, sec. 1 of the amendments to the constitution of the United States " . . . nor shall any state deprive any person of life, liberty or property without due process of law . . ."

Nor is it obnoxious to the provisions of Cons. U. S. Art. IV, sec. 2 "The citizens of each state shall be entitled to all privileges and immunities of citizens of the several states."

Such statute is a proper exercise of the police power, by the legislature in a matter concerning only the people of the state, and it was unnecessary for the legislature to consider what effect it would have upon aliens or citizens of other states, since it involves only the conservation of shellfish in the public waters of the state.

BLODGETT, J., dissents.

CRIMINAL COMPLAINT. Heard on constitutional questions certified to the Supreme Court.

DUBOIS, C. J. The above entitled cases are complaints brought before the District Court of the First Judicial District for violations of the provisions of Pub. Laws, cap. 437, § 1, passed May 7, 1909, and severally charged that the defendant, therein named, at a certain time therein specified, and at a certain place within the territorial waters of the state therein designated, did catch and take a certain lobster, and also that he did place, set, keep, maintain, supervise, lift, raise and draw, and cause to be placed, set, kept, maintained, supervised, lifted, raised and drawn, in and from said place in said waters, a certain pot and other contrivance designed and adapted for the catching and taking of lobsters.

These cases have been certified from the district court aforesaid to this court, in compliance with the provisions of Gen. Laws, 1909, cap. 298, § 1, for the hearing and determination of certain questions as to the constitutionality of sections 1 and 2 of said cap. 437. Said sections read as follows:

"SECTION 1. No person, either as principal, agent, or servant, shall, at any time, catch or take any lobster from any of the waters in the jurisdiction of this state, or place, set, keep, maintain, supervise, lift, raise, or draw in or from any of said waters, or cause to be placed, set, kept, maintained, supervised, lifted, raised, or drawn in or from any of said waters, any pot or other contrivance designed or adapted for

the catching or taking of lobsters, unless licensed so to do as hereinafter provided.  Every person who shall violate any of the provisions of this section shall be fined twenty dollars or be imprisoned not more than thirty days, or both, for each such offence."

"SEC. 2.  The commissioners of inland fisheries may grant or refuse to grant licenses to catch and take lobsters from the waters within the jurisdiction of this state (in the manner, at the times, and subject to the regulations provided in this act) to such citizens of this state as have resided in this state for at least one year next preceding the granting of such license as they may think proper.  Whenever any such license shall be granted, the same shall be granted to expire on the 15th day of November next succeeding the granting of the same, unless sooner revoked as hereinafter provided, and each person to whom such license shall be granted shall, for each license, pay to said commissioners the sum of five dollars for the use of the state.  Said commissioners, in their annual report to the general assembly, shall state the number of licenses granted, with the names of the persons licensed and the amount of money received therefor.  Said commissioners shall issue to each person licensed as aforesaid a certificate stating the name of the person to whom such license has been granted and the date of expiration of such license, and shall also issue to each person so licensed a metal badge in such form and bearing such inscription as said commissioners shall determine. If any person licensed as aforesaid shall, at any time, be adjudged guilty of any violation of any of the provisions of this act, after full hearing by said commissioners or a majority of them, the said commissioners or a majority of them shall revoke the license issued to such person, and such person shall thereupon cease to have any authority thereunder."

The constitutional questions are raised upon the record in the several cases by defendant's motion to dismiss, by

the defendant's demurrers to the complaint, and by complainant's demurrers to the defendant's pleas.

In the case of Kofines and that of Saderas, the questions are brought upon the record by motions to dismiss the complaints, the motions being identical.

In the case of Crestodolas the questions are brought upon the record by demurrer to the complaint.

In the case of Raftak and that of Deamotares, the questions are brought upon the record by motions to dismiss filed by the respondents after the filing, by the complainant, of demurrers to pleas. The motions to dismiss are identical.

The pleas filed in the case of Raftak set forth:

First. That the respondent, at the time mentioned in the complaint, was and for a long time (but less than one year) had been a citizen of the State of Rhode Island.

Second. That the respondent, at the time mentioned in the complaint, was a citizen of the United States and of the State of New York and was, and for a long time had been, a resident of the City of Newport, in the State of Rhode Island.

Third. That the acts with which he stands charged in the complaint were performed by him in the course of his employment as the servant or agent of Angelo Maniotis who, at the time mentioned in the complaint, was duly licensed under the provisions of said section 2 of chapter 437, of the Public Laws.

The pleas filed in the case of Deamotares set forth:

First. That the respondent, at the time mentioned in the complaint, was and for more than a year had been a resident in and a domiciled inhabitant of the City of Newport; and that, having been born in the Kingdom of Greece, he had duly declared his intention to become a citizen of the United States before the Superior Court of the State of Rhode Island, in said Newport, on or about the 27th day of February, A. D. 1908, in accordance with the provisions of the naturalization laws of the United States, but that he had not then been duly naturalized.

Second. That the acts with which he stands charged in the complaint were performed by him in the course of his employment as the servant and agent of Diomatares Diomatares, who, at the time mentioned in the complaint, was duly licensed under the provisions of said section 2 of chapter 437 of the Public Laws.

It may be observed that the record does not specifically disclose the political status of Kofines, Saderas, or Crestodolas, *i. e.*, whether aliens or citizens of Rhode Island, or citizens of other states of the Union; that the pleas filed by Raftak disclose the inconsistent claims that he is a citizen of Rhode Island who has not resided in this state a full year and that he is a citizen of the State of New York and that the pleas filed by Deamotares disclose that he is an alien.

It will also be observed that it does not appear in the record of any of the cases that any of the respondents have applied for and been refused licenses under section 2 of chapter 437.

The questions brought upon the record and raised in each of the cases are identical and are as follows, viz.:

(1) Are said sections 1 and 2 of said chapter 437 in conflict with the provisions of section 17, Article I, of the Constitution of Rhode Island, which is as follows, viz.:

"The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state. But no new right is intended to be granted, nor any existing right impaired, by this declaration," in that the provisions of said sections 1 and 2, chapter 437, grant to the Commissioners of Inland Fisheries the arbitrary right to refuse licenses under said chapter to citizens of the State and thereby impair the enjoyment and free exercise of the rights of fishery to which the people of the State are entitled under said section of the constitution?

(2) Are said sections 1 and 2 of said chapter 437, in conflict with the provisions of Section 10, Article 1, of the

Constitution of Rhode Island, which is as follows, viz.:

" . . . . . . ; nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land," in that the provisions of said sections 1 and 2, chapter 437, grant to the said Commissioners of Inland Fisheries the arbitrary right to refuse licenses under said chapter to citizens of the state and thereby deprive citizens of liberty and property, contrary to the provisions of said section of the constitution?

(3) Are said sections 1 and 2 of said chapter 437 in conflict with the provisions of that portion of section 1, Article 14, of the amendments to the Constitution of the United States, which is as follows, viz.:

" . . . . . nor shall any state deprive any person of life, liberty, or property, without due process of law . . . . . . . . . . " in that the provisions of said sections 1 and 2, chapter 437, grant to the said Commissioners of Inland Fisheries the arbitrary right to refuse licenses under said chapter to citizens of the State of Rhode Island and thereby deprive citizens of liberty and property, contrary to the said provisions of said section of the amendments to the Constitution of the United States?

(4) Are said sections 1 and 2 of said chapter 437 in conflict with the provisions of Section 17, Article 1, of the Constitution of Rhode Island (*supra*) in that the provisions of said sections 1 and 2 of chapter 437 deprive such citizens of the state as have resided therein for less than one year of the enjoyment and free exercise of the rights of fishery to which they are entitled under the provisions of said section of the constitution?

(5) Are said sections 1 and 2 of said chapter 437 in conflict with the provisions of Section 10 of Article 1 of the Constitution of Rhode Island (*supra*) in that the provisions of said sections 1 and 2 of chapter 437 deprive such citizens of the state as have resided therein for less than one year of liberty and property contrary to the provisions of said section of the constitution?

(6)   Are said sections 1 and 2 of said chapter 437 in
conflict with the said provisions of Section 1 of Article 14 of
amendments to the Constitution of the United States (*supra*)
in that the provisions of said sections 1 and 2 of chapter 437
deprive such citizens of the State of Rhode Island as have
resided therein for less than one year of liberty and property
contrary to the provisions of said section of the amendments
to the Constitution of the United States?

(7)   Are said sections 1 and 2 of said chapter 437 in con-
flict with the provisions of Section 17, Article 1, of the
Constitution of Rhode Island (*supra*) in that the provisions
of said sections 1 and 2 of chapter 437 deprive aliens, who
have fixed their domicile within the state and have resided
therein for more than one year, of the enjoyment and free
exercise of the rights of fishery to which they are entitled
under the provisions of said section of the constitution?

(8)   Are said sections 1 and 2 of said chapter 437 in con-
flict with the provisions of Section 10, Article 1, of the
Constitution of Rhode Island (*supra*) in that the provisions
of said sections 1 and 2 of said chapter 437 deprive aliens,
who have fixed their domicile within the state and have
resided therein for more than one year, of liberty and prop-
erty, contrary to the provisions of said section of the con-
stitution?

(9)   Are said sections 1 and 2 of said chapter 437 in
conflict with the said provisions of Section 1 of Article 14
of amendments to the Constitution of the United States
(*supra*) in that the provisions of said sections 1 and 2 of
said chapter 437 deprive aliens, who have fixed their domicile
within the State of Rhode Island and have resided therein
for more than one year, of liberty and property, contrary
to the provisions of said section of the amendments to the
Constitution of the United States?

(10)   Are said sections 1 and 2 of said chapter 437 in
conflict with the provisions of Section 17, Article 1, of the
Constitution of Rhode Island (*supra*) in that the provisions
of said sections 1 and 2 of chapter 437 interfere with the

rights of citizens to engage in the lobster fisheries in the waters of this state by employing therein such suitable servants and agents as they see fit, contrary to the provisions of said section of the constitution?

(11) Are said sections 1 and 2 of said chapter 437 in conflict with the provisions of Section 2, Article 4, of the Constitution of the United States, which is as follows, viz.:

"The citizens of each state shall be entitled to all privileges and immunities of citizens of the several states," in that the provisions of said sections 1 and 2, chapter 437, interfere with the privileges and immunities of citizens of other states by prohibiting them from doing manual labor as servants in connection with the lobster fisheries, contrary to the provisions of said section of the constitution?

(12) Are said sections 1 and 2, chapter 437, in conflict with the provisions of that portion of Section 1, Article 14, of the amendments to the Constitution of the United States, which is as follows, viz.:

" . . . . . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . . . .",
in that the provisions of said sections 1 and 2, chapter 437, abridge the privileges and immunities of citizens of the United States by prohibiting them from doing manual labor as servants in connection with the lobster fisheries, contrary to the said provisions of said section of the amendments to the Constitution of the United States?

We approach this subject mindful of the presumption of constitutionality in favor of the act in question.

(1) The presumption of innocence in this particular obtains and "The rule generally laid down is, that statutes should be sustained unless their unconstitutionality is clear beyond a reasonable doubt. A reasonable doubt is to be resolved in favor of the legislative action, and the act sustained. Cooley on Constitutional Limitations, p. 252 and cases cited. 'Before an act is declared to be unconstitutional it should clearly appear that it cannot be supported by any reasonable

intendment or allowable presumption.' *People* v. *Supervisors of Orange*, 17 N. Y. 235, 241. 'All intendments favor constitutionality,' *Crowley* v. *State of Oregon*, 11 Oregon, 512. 'Courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond a reasonable doubt.' *Wellington et al., Petitioners*, 16 Pick. 87, 95, per Shaw, C. J. 'It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed,' says Justice Washington, 'to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt. *Ogden* v. *Saunders*, 12 Wheat. 213, 270.'" Durfee, C. J., in *State* v. *The District of Narragansett*, 16 R. I. 424, 440.

Therefore it is incumbent upon the respondents to satisfy this court beyond all reasonable doubt that the act in question is unconstitutional in the particulars complained of.

Another consideration of great importance is the necessity of ascertaining whether the act in question comes within the police power of the state. Life, liberty and the pursuit of happiness are held to be among the inalienable rights with which all men are endowed by their Creator, and that to secure these rights, governments are instituted among men. It is therefore evident that the object of society is to live, increase and flourish. It is therefore interested in the preservation of itself and of its members. "Self-preservation has been termed the first law of nature. It is of the most ancient origin: it antedates all constitutions and statutes made by man. It is the law under which we live, move, and have our being: it is a law governing all persons, natural and artificial. High and low, rich and poor, wise and foolish, old and young, are subject to its inexorable sway. Obedience to it is rewarded, while disobedience to it is inevitably punished. Out of its observance arises the doc-

trine of the survival of the fittest. It is an attribute of all corporations, from the State itself down to the least of its creatures. Upon it depends the police power of the State, which, in its broadest acceptation, means the general power of a government to preserve and promote public welfare by prohibiting all things hurtful to the comfort, safety, and welfare of society, and by establishing such rules as may be conducive of public benefit.'' *Ponte* v. *Marconi*, 27 R. I. 6.

''Frequently when questions of conflict between national and State authority are made, and also when it is claimed that government has exceeded its just powers in dealing with the property and controlling the actions of individuals, it becomes necessary to consider the extent and pass upon the proper bounds of another State power, which, like that of taxation, pervades every department of business and reaches to every interest and every subject of profit or enjoyment. We refer to what is known as the police power.

''The police of a state, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offences against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others.'' . . .

''No definition of the powers can be more complete and satisfactory than some which have been given by eminent jurists in deciding cases which have arisen from its exercise, and which have been so often approved and adopted, that to present them in any other than the language of the decisions would be unwise, if not inexcusable. Says Chief Justice Shaw, 'We think it is a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it

shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this Commonwealth is · . . . held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient. This is very different from the right of eminent domain,—the right of a government to take and appropriate private property whenever the public exigency requires it, which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power; the power vested in the legislature by the constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the Commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise.'

" ' This police power of the State,' says another eminent judge, 'extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State. According to the maxim, *Sic utere tuo ut alienum non laedas*, which being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.' And again: (By this) 'general police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and pros-

perity of the State; of the perfect right in the legislature to do which, no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.' And neither the power itself, nor the discretion to exercise it as need may require, can be bargained away by the State.

"In the American constitutional system, the power to establish the ordinary regulations of police has been left with the individual States, and it cannot be taken from them, either wholly or in part, and exercised under legislation of Congress. Neither can the national government, through any of its departments or officers, assume any supervision of the police regulations of the States. All that the federal authority can do is to see that the States do not, under cover of this power, invade the sphere of national sovereignty, obstruct or impede the exercise of any authority which the Constitution has confided to the nation, or deprive any citizen of rights guaranteed by the federal Constitution." Cooley, Const. Lim. 7th Ed. p. 829, *et seq.*

"There is also a common assent that the legislature has the right of control in all matters affecting public safety, health, and welfare, on the ground that these are within the indefinable but unquestioned purview of what is known as the police power. It is indefinable, because none can foresee the everchanging conditions which may call for its exercise; and it is unquestioned, because it is a necessary function of government to provide for the safety and welfare of the people. Private rights are often involved in its exercise, but a law is not on that account rendered invalid or unconstitutional. The first inquiry is whether the subject of the law is within the power; for, if it is, the legislature has jurisdiction to enact it and its terms are subject to a reasonable legislative discretion." *Opinion to the Governor*, 24 R. I. 603, 605.

As was said by Tillinghast, J., in *State* v. *Dalton*, 22 R. I. 77–86, in commenting upon the definition of "liberty" as given in *People* v. *Gillson*, 109 N. Y. 389: "this inalienable

right is trenched upon and impaired whenever the legislature prohibits a man from carrying on his business in his own way, provided always, of course, that the business and the mode of carrying it on are not injurious to the public, and provided, also, that it is not a business which is affected with a public use or interest."

(2)  Now the subject matter of cap. 437, the act in question, relates not merely to a business affected with a public use and interest, but to the public use and interest itself.  The act purports to be in substitution of an act entitled "An act for the better protection of the lobster fisheries."  By this it means the lobster fisheries of the people of the state. One of the fisheries embraced in the great franchise originally granted to the people by the king in the charter and afterwards perpetuated to them by the constitution.  The words "people of the state" have received the following judicial construction:  "The Constitution in its preamble starts out, 'We, the people of the State,' etc.  In article 1, section 2, it is declared that all governments are instituted for the protection, safety and happiness of the people. In the same article, section 6, it is further declared that the right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated.  And again in section 17, 'The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of the State,' etc.  These illustrations, and others might be given, show that the term 'people,' as used in the constitution, is broad and comprehensive, comprising in most instances all the inhabitants of the State.  Article 2 as amended by article 7, however, defines the qualifications necessary for electors; and, inasmuch as the Constitution provides no mode for obtaining the consent of the people except by the expression of it through the votes of the electors, we think that the consent of the people mentioned in article 4, section 13, means the consent of the electors manifested by the

majority of their votes. We find nothing to warrant its restriction to such of the electors as are taxpayers, and we are of the opinion, therefore, that the word 'people,' in the section under consideration, is to be construed to include registry voters as well as taxpayers." *In re the Incurring of State Debts*, 19 R. I. 610, 613. As all the inhabitants of the state, men, women and children, citizens and aliens are interested in the franchise, and as all cannot fish for lobsters, and but comparatively few do, it is manifest that if the interests of all are to be conserved the fishing must be carried on for the ultimate benefit of the people of the state and not merely for the profit and emolument of the fishermen engaged in the business, whose conduct in the premises must be unselfish enough to include the interests of those who cannot personally attend to the matter. According to the United States census for the year 1910 the total population of this state was 542,610 and according to the report of the Commissioners of Inland Fisheries, there were, in the year 1909, engaged in lobster fishing in the public waters of the state 381 men, and there were used for the purpose during that year 248 boats and 23,220 lobster pots. The commissioners also estimated the number of pounds of lobsters taken in that year from the public waters of the state to be 1,395,983. Even if we should assume the amount to be in round numbers 1,575,000 pounds, and estimate the population of the state for the year 1909 to be 525,000, an equal division by weight of the lobsters taken, among the inhabitants of the state, would give each person three pounds. It is self evident that each person does not annually get, and never can get, his or her proportional part of the total catch of lobsters in any year, therefore a division of the catch of lobsters among the people of the state cannot be considered to be a feasible way in which to preserve the rights of the people in the lobster fishery. If there was to be such a division of the catch among the people, it would be proper to pay the fishermen a fair price for their labor, a fair return for the capital invested, a fair amount for wear and tear of

boats, tackle and fishing-gear, and such other items as are usually considered in mercantile adventures of this sort. It goes without saying that people of the state residing in portions of its territory remote from the seashore could hardly afford, even if it were possible for them to do so, to go to the shore and attempt to engage in lobster fishing merely for the purpose of obtaining what they might deem to be their fair share of lobsters from the public waters of the state. All children of tender years, the aged and infirm, together with delicate women would be absolutely debarred from participation in a fishery in which all are interested. In such circumstances it is necessary to consider how the people of the state may receive the greatest benefit from the conservation of their interests in this regard. The great majority of the people undoubtedly have heretofore bought and in the future will be obliged to buy their lobsters, therefore it is for their interest to have them plentiful and cheap. And by the immutable law of supply and demand, when unhampered by other influences, cheapness will result from plenty. Free and unrestrained fishing might, for a time, seem to accomplish that result because thereby more lobsters would be taken and placed for sale upon the market, but without regard to the age, size or condition of the same. Without protection from the rapacity of man, lobsters inevitably must become scarcer, and consequently dearer. This has been the costly experience of all countries where the experiment has been tried. The natural tendency to kill the goose that lays the golden egg is always exhibited when the opportunity is afforded. And when anyone, attempting to stay the unsparing hand of the despoiler, suggests that something should be saved for posterity he is likely to receive this interrogative reply: Why should we care for posterity, what has it ever done for us? After us, the deluge. It is necessary that man should be saved from the consequences of his own selfishness, thoughtlessness and wastefulness in the matter of fisheries. And for

this purpose an ounce of prevention is worth a pound of cure.

In this connection the following quotation from the report of the Commissioners of Inland Fisheries for the year 1908, is deemed pertinent:

"The statistics of the lobster fishery, which have been gathered for the last five years, are more nearly complete than those of any other branch of the fisheries of the State, and, for several reasons, these data are just now of paramount importance. For many years this industry had been evidently waning, so that the outlook had become extremely serious, and numerous and various remedies were suggested. This was the situation in 1901 when the General Assembly passed laws that could be enforced and placed their enforcement in the hands of the Commission of Inland Fisheries. These laws, designed to protect young lobsters and egg-lobsters, have, since 1901, been conscientiously enforced as far as possible by your Commission and their deputies. In 1900, also, the lobster propagating establishment at your Commission's Wickford station began to get practical results, which have increased in importance from year to year. Since the work of propagation and enforcement of the laws regulating lobster fishery began, there has been a remarkable increase in the catch of lobsters. This is a fact which is commonly known to all those interested, and one which requires no statistical proof. However, statistics do confirm this fact and would seem to answer definitely the much-discussed question whether or not artificial propagation and protective regulation can be effective in maintaining the lobster industry.

"The total catch of lobsters in the State has increased from 376,994 pounds in 1904 to 1,471,344 pounds in 1908, an increase of 1,094,350 pounds. That this unparalleled increase is not spasmodic or accidental is evidenced by the steady increase in consecutive years:

| 1904 | 1905 | 1906 | 1907 | 1908 |
|------|------|------|------|------|
| 376,994 | 499,300 | 671,914 | 929,423 | 1,471,344 |

"That the increase is not referable to the introduction of statistics from additional localities is shown by the statistics from Newport alone, which are summarized as follows:

| 1904 | 1905 | 1906 | 1907 | 1908 |
|------|------|------|------|------|
| 226,994 | 301,659 | 353,573 | 581,189 | 665,009 |

"It is known that the total number of lobster pots has very greatly increased, and to this fact one might be inclined to attribute the increased catch. The facts are otherwise; for, while the number of pots had increased from 7,935 in 1904 to 20,011 in 1908 (more than 250 per cent.), the catch per pot has not shown a proportionate decrease. On the contrary, despite this great multiplication of pots the catch per pot not only shows no decrease, but has actually increased approximately fifty per cent. The following is the catch per pot for the past five years:

| 1904 | 1905 | 1906 | 1907 | 1908 |
|------|------|------|------|------|
| 48— | 54+ | 59+ | 76+ | 74— |

"Making allowance for the usual feeling of uncertainty in depending upon statistics where the issue is close, there can be no reasonable doubt that vast improvement in the condition of the lobster industry in this State in the last decade is real. For a sharp contrast with the situation here, we introduce the following quotation from the 'Fishing Gazette,' which needs no comment, but which recalls the statements of ten years ago regarding the condition of our own lobster industry: 'The market for canned lobster continues somewhat depressed not only in the American market but also abroad. Stocks are fairly heavy. Newfoundland advices are that lobsters are almost completely fished out around the whole coast. Canners who once put up three thousand cases cannot produce two hundred now.'

" 'The St. John's (N. F.) 'Trade Review' says: 'There is no use mincing matters. The present deplorable condition of our lobster fishery is due entirely to the cowardice of the government, who are afraid to carry out the law. They have a regulation calling for a defined length of lobster for packing, but they know that this law is broken every day

in the year; but, fearing to lose the fisherman's vote, they will not prosecute. Thus it goes on year after year, the available lobsters becoming smaller and smaller, until at present it sometimes takes the meat of thirty or forty fish to fill a one-pound can.' ('Fishing Gazette,' Jan. '09, p. 103.)'"

From time to time, for many years, the legislature of this State has enacted statutes for the preservation of game and fish and by Pub. Laws, cap. 920, passed Mar. 21, 1871, provided for the appointment of commissioners of inland fisheries whose duties, *inter alia*, were "to introduce, protect and cultivate fishing in our inland waters." The protection of lobsters was afterwards intrusted to them and in their report, to the General Assembly for the year 1909, it appears that during the preceding eleven years they have been engaged in hatching, rearing and liberating lobsters for the benefit of the people of the State and that more than a million lobsters have been propagated and liberated by them in the past ten years, and they claim that for several years their annual output of such lobsters had been many times greater than that from any of the several stations engaged in like work, both in this country and abroad. It also appears from the same report that the expense to the State for laboratory, services and expenses of deputies under the lobster law, and for egg-lobsters purchased, for that year amounted to over ten thousand dollars. The report of said commissioners for the year 1908, already alluded to, contains the following remarks relative to the lobster fishery and also concerning an act which afterwards became the statute now under consideration: "On account of the present importance of the industry and the increased difficulties and expense of enforcing the protective legislation, your Commissioners have recommended to the consideration of your Honorable Body certain changes in the present law which they believe will facilitate its enforcement and give a fairer return to the citizens of the State, to whom these valuable natural resources belong, and upon whom

rests the responsibility and expense of maintenance. These recommendations are embodied in 'An act in substitution of Chapter 969 of the Public Laws, passed at the January session, A. D. 1902, entitled 'An act in substitution of Chapter 857 of the Public Laws, passed at the January session, A. D. 1901, entitled 'An act for the better protection of the lobster fisheries,'" introduced into the Senate. The provision in the act substituting, for the present method of measuring the lobster from tip of bone on head to the end of tail, the measurement of the body shell alone, will be of great convenience to fishermen and deputies alike. It leaves the legal length of the lobster unchanged, and has the distinct advantage that it will do away with the common practice of stretching of lobsters just under the legal length. This practice has not only given rise to irritating disputes, but has been the means of destroying great numbers of young lobsters which are killed by the stretching, whether they prove to be of legal length or not. The new method has been in force for a year or more in Maine, and has proved very satisfactory. The provision in the proposed law requiring all persons engaged in the lobster fishery to be licensed is also strongly recommended by your Commissioners. It should also be stated that the Conference of the Fish Commissioners of the New England States, held in Boston in December, 1908, at the instance of Governor Guild, formally and unanimously resolved to approve of the licensing of lobster fishermen as an admirable procedure, and that the Fish Commissioners of Maine and Connecticut at least, have recommended the provision to their respective legislatures. Some of the advantages of the license provision are: "The greater ease and accuracy of keeping track of lobster fishermen; the providing of an appropriate punishment for willful violation of the law, by revoking the license; the partial compensation to the State for the use of these natural resources and for the expense of the enforcement of the protective legislation. The provision in the proposed act which limits the privileges of the lobster fishery to citi-

zens commends itself to the approval of your Commissioners on the general ground that the fishery is one of those natural resources of much importance which has not been developed by individual enterprise, and also on the ground that the citizens of the State, through their General Assembly, are bearing the expense of the maintenance and development of the lobster fishery."

It thus appears that the General Assembly has authorized the expenditure of, and that there has been expended, a liberal amount of money for the purpose of not only preserving, but if possible of increasing the supply of lobsters for the benefit of the people of the State. It would be of little benefit to the people of the State if lobsters were hatched, cared for during a critical period of their existence and until they attained an age and strength sufficient to enable them to protect themselves against their natural foes, if they were to be liberated without the protection of the law against the cupidity of man. In such circumstances there would be little hope of increase on their part. No one will deny that lobsters are animals *ferae naturae* and that those which inhabit the public waters of the State are the common property of the people of the State until caught and when caught by one having the right to fish for them belong to him who thus reduced them to captivity. This condition calls loudly for the exercise of the police power of the State if the subject comes within the purview of that power. It hardly needs the citation of authority to convince any reflecting person that it does, but fortunately authorities are not lacking on the subject and a few will suffice. As was said by Mr. Justice, now Chief Justice White, in *Geer* v. *Connecticut*, 161 U. S. 519, *et seq*: "From the earliest traditions the right to reduce animals *ferae naturae* to possession has been subject to the control of the law-giving power," and again, "The common law of England also based property in game upon the principle of common ownership, and therefore treated it as subject to governmental authority," and further (p. 527): "The practice of the government of

England from the earliest time to the present has put into execution the authority to control and regulate the taking of game.

"Undoubtedly this attribute of government to control the taking of animals *ferae naturae*, which was thus recognized and enforced by the common law of England, was vested in the colonial governments, where not denied by their charters, or in conflict with grants of the royal prerogative. It is also certain that the power which the colonies thus possessed passed .to the States with the separation from the mother country, and remains in them at the present day, in so far as its exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution. Kent, in his Commentaries, states the ownership of animals *ferae naturae* to be only that of a qualified property. 2 Kent. Com. 347. In most of the States laws have been passed for the protection and preservation of game. We have been referred to no case where the power to so legislate has been questioned, although the books contain cases involving controversies as to the meaning of some of the statutes. *Commonwealth* v. *Hall*, 128 Mass. 410; *Commonwealth* v. *Wilkinson*, 139 Penn. St. 298; *People* v. *O'Neil*, 71 Michigan, 325. There are also cases where the validity of some particular method of enforcement provided in some of the statutes has been drawn in question. *Kansas* v. *Saunders*, 19 Kansas, 127; *Territory* v. *Evans*, 2 Idaho, 658.

"The adjudicated cases recognizing the right of the States to control and regulate the common property in game are numerous. In *McCready* v. *Virginia*, 94 U. S. 391, the power of the State of Virginia to prohibit citizens of other States from planting oysters within the tide waters of that State was upheld by this court. In *Manchester* v. *Massachusetts*, 139 U. S. 240, the authority of the State of Massachusetts to control and regulate the catching of fish within the bays of that State was also maintained. See also *Phelps* v. *Racey*, 60 N. Y. 10; *Magner* v. *People*, 97 Illinois, 320; *American*

*Express Co.*, v. *People*, 133 Illinois, 649; *State* v. *Northern Pacific Express Co.*, 58 Minnesota, 403; *State* v. *Rodman*, 58 Minnesota, 393; *Ex parte Maier*, 103 California, 476; *Organ* v. *State*, 56 Arkansas, 267, 270; *Allen* v. *Wyckoff*, 48 N. J. Law, 90, 93; *Roth* v. *State*, 51 Ohio, St. 209; *Gentile* v. *State*, 29 Indiana, 409, 415; *State* v. *Farrell*, 23 Mo. App. 176, and cases there cited; *State* v. *Saunders, ubi sup.*; *Territory* v. *Evans, ubi sup.*

"Whilst the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the State, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government, as distinct from the people, or for the benefit of private individuals as distinguished from the public good. Therefore, for the purpose of exercising this power, the State, as held by this court in *Martin* v. *Waddell*, 16 Pet. 367, represents its people, and the ownership is that of the people in their united sovereignty. The common ownership, and its resulting responsibility in the State, is thus stated in a well considered opinion of the Supreme Court of California:

" 'The wild game within a State belongs to the people in their collective sovereign capacity. It is not the subject of private ownership except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or traffic and commerce in it, if it is deemed necessary for the protection or preservation of the public good.' *Ex parte Maier, ubi sup.*

"The same view has been expressed by the Supreme Court of Minnesota, as follows:

" 'We take it to be the correct doctrine in this country, that the ownership of wild animals, so far as they are capable of ownership, is in the State, not as a proprietor but in its sovereign capacity as the representative and for the benefit of all its people in common.' *State* v. *Rodman, ubi sup.*

"The foregoing analysis of the principles upon which alone rests the right of an individual to acquire a qualified ownership in game, and the power of the State, deduced therefrom, to control such ownership for the common benefit, clearly demonstrates the validity of the statute of the State of Connecticut here in controversy. The sole consequence of the provision forbidding the transportation of game, killed within the State, beyond the State, is to confine the use of such game to those who own it, the people of that State. The proposition that the State may not forbid carrying it beyond her limits involves, therefore, the contention that a State cannot allow its own people the enjoyment of the benefit of the property belonging to them in common, without at the same time permitting the citizens of other States to participate in that which they do not own. It was said in the discussion at the bar, although it be conceded that the State has an absolute right to control and regulate the killing of game as its judgment deems best in the interests of the people, inasmuch as the State has here chosen to allow the people within her borders to take game, to dispose of it, and thus cause it to become an object of State commerce, as a resulting necessity such property has become the subject of interstate commerce, and is hence controlled by the provisions of article 1, section 8 of the Constitution of the United States. But the errors which this argument involves are manifest. It presupposes that where the killing of game and its sale within the State is allowed, that it thereby becomes commerce in the legal meaning of that word. In view of the authority of a State to affix conditions to the killing and sale of game, predicated as is this power on the peculiar nature of such property and its common ownership by all the citizens of the State, it may be well doubted whether commerce is created by an authority given by a State to reduce game within its borders to possession, provided such game be not taken, when killed, without the jurisdiction of the State. The common ownership imports the right to keep the property, if the sovereign so chooses, always within its jurisdiction

for every purpose. The qualification which forbids its removal from the State necessarily entered into and formed part of every transaction on the subject, and deprived the mere sale or exchange of these articles of that element of freedom of contract and of full ownership which is an essential attribute of commerce. Passing, however, as we do, the decision of this question, and granting that the dealing in game killed within the State, under the provision in question, created internal State commerce, it does not follow that such internal commerce becomes necessarily the subject-matter of interstate commerce, and therefore under the control of the Constitution of the United States. The distinction between internal and external commerce and interstate commerce is marked, and has always been recognized by this court. In *Gibbons* v. *Ogden*, 9 Wheat, 1, 194, Mr. Chief Justice Marshall said:

" 'It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient and certainly unnecessary.

" 'Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of the State. The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, to those internal concerns which affect the

States generally, but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself.'

"So, again, in *The Daniel Ball*, 10 Wall. 557, 564, this court, speaking through Mr. Justice Field, said:

"'There is undoubtedly an internal commerce which is subject to the control of the States. The power delegated to Congress is limited to commerce 'among the several States,' with foreign nations and with Indian tribes. This limitation necessarily excludes from the Federal control, commerce not thus designated, and of course that commerce which is carried on entirely within the limits of a State and does not extend to or affect other States.'

"The fact that internal commerce may be distinct from interstate commerce, destroys the whole theory upon which the argument of the plaintiff in error proceeds. The power of the State to control the killing of and ownership in game being admitted, the commerce in game which the State law permitted, was necessarily only internal commerce, since the restriction that it should not become the subject of external commerce went along with the grant and was a part of it. All ownership in game killed within the State came under this condition, which the State had the lawful authority to impose, and no contracts made in relation to such property were exempt from the law of the State consenting that such contracts be made, provided only they were confined to internal and did not extend to external commerce.

"The case in this respect is identical with *Kidd* v. *Pearson*, 128 U. S. 1. The facts there considered were briefly as follows: The State of Iowa permitted the distillation of intoxicating liquors for 'mechanical, medicinal, culinary and sacramental purposes.' The right was asserted to send out of the State intoxicating liquors made therein on the ground

that, when manufactured in the State, such liquors became the subject of interstate commerce, and were thus protected by the Constitution of the United States; but this court, through Mr. Justice Lamar, pointed out the vice in the reasoning, which consisted in presupposing that the State had authorized the manufacture of intoxicants, thereby overlooking the exceptional purpose for which alone such manufacture was permitted. So here the argument of the plaintiff in error substantially asserts that the State statute is an unqualified right to kill game, when in fact it is only given upon the condition that the game killed be not transported beyond the State limits. It was upon this power of the State to qualify and restrict the ownership in game killed within its limits that the court below rested its conclusion, and similar views have been expressed by the courts of last resort of several of the States. In *State* v. *Rodman,* 58 Minnesota, 393, 400, the Supreme Court of Minnesota said:

" 'The preservation of such animals as are adapted to consumption as food or to any other useful purpose, is a matter of public interest; and it is within the police power of the State, as the representative of the people in their united sovereignty, to make such laws as will best preserve such game, and secure its beneficial use in the future to the citizens, and to that end it may adopt any reasonable regulations, not only as to time and manner in which such game may be taken and killed, but also imposing limitations upon the right of property in such game after it had been reduced to possession. Such limitations deprive no person of his property, because he who takes or kills game had no previous right of property in it and when he acquires such right by reducing it to possession he does so subject to such conditions and limitations as the legislature has seen fit to impose.' See, also, *State* v. *Northern Pacific Express Co.,* 58 Minnesota, 403.

"So, also, in *Magner* v. *The People,* 97 Illinois, 320, 333, the Supreme Court of Illinois said:

" 'So far as we are aware it has never been judicially denied that the government under its police powers may make regulations for the preservation of game and fish, restricting their taking and molestation to certain seasons of the year, although laws to this effect, it is believed, have been enforced in many of the older states since the organization of the Federal Government. . . . The ownership being in the people of the State, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the legislature, as the representative of the people of the State, may withhold or grant to individuals the right to hunt and kill game or qualify or restrict as in the opinions of its members will best subserve the public welfare. Stated in other language, to hunt and kill game is a boon or privilege, granted either expressly or impliedly by the sovereign authority—not a right inherent in each individual, and consequently nothing is taken away from the individual, when he is denied the privilege at stated seasons of hunting and killing game. It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the State, and hence by implication it is the duty of the legislature to enact such laws as will best preserve the subject of the trust and secure its beneficial use in the future to the people of the State. But in any view, the question of individual enjoyment is one of public policy and not of private right.'

"See also Ex parte Maier, 103 California, 476; Organ v. The State, 56 Ark., 267. It is, indeed, true that in State v. Saunders, 19 Kansas, 127, and Territory v. Evans, 2 Idaho, 658, it was held that a State law prohibiting the shipment outside of the State of game killed therein violated the interstate commerce laws of the Constitution of the United States, but the reasoning which controlled the decision of these cases is, we think, inconclusive from the fact that it did not consider the fundamental distinction between the qualified ownership in game and the perfect nature of

ownership in other property, and thus overlooked the authority of the State over the property in game killed within its confines, and the consequent power of the State to follow such property into whatever hands it might pass with the conditions and restrictions deemed necessary for the public interests.

"Aside from the authority of the State, derived from the common ownership of game and the trust for the benefit of its people which the State exercises in relation thereto, there is another view of the power of the State in regard to the property in game, which is equally conclusive. The right to preserve game flows from the undoubted existence in the State of a police power to that end, which may be none the less efficiently called into play, because by doing so interstate commerce may be remotely and indirectly affected. *Kidd* v. *Pearson,* 128 U. S. 1; *Hall* v. *De Cuir,* 95 U. S. 485; *Sherlock* v. *Alling,* 93 U. S. 99, 103; *Gibbons* v. *Ogden,* 9 Wheat. 1. Indeed, the source of the police power as to game birds (like those covered by the statute here called in question) flows from the duty of the State to preserve for its people a valuable food supply. *Phelps* v. *Racey,* 60 N. Y. 10; *Ex parte Maier, ubi sup.*; *Magner* v. *The People, ubi sup.,* and cases there cited. The exercise by the State of such power therefore comes directly within the principle of *Plumley* v. *Massachusetts,* 155 U. S. 461, 473. The power of a State to protect by adequate police regulations its people against the adulteration of articles of food, (which was in that case maintained,) although in doing so commerce might be remotely affected, necessarily carries with it the existence of a like power to preserve a food supply which belongs in common to all the people of the State, which can only become the subject of ownership in a qualified way, and which can never be the object of commerce except with the consent of the State and subject to the conditions which it may deem best to impose for the public good."

The entire subject is therefore one clearly within the police power of the State and the power of the General Assembly

in the premises is not abridged by the provisions of Article 1, section 17 of the Constitution. As we said in the case of *Payne & Butler* v. *Providence Gas Co.*, 31 R. I. 295–326: "No greater privileges were reserved to the people than they already had and no powers or rights of the General Assembly were thereby abridged. Therefore the whole subject of fisheries, floating and shellfish, and all kinds of shell-fish, whether oysters, clams, quahaugs, mussels, scallops, lobsters, crabs or fiddlers, or however they may be known and designated and wherever situate within the public domain of the State of Rhode Island, are under the fostering care of the General Assembly. It is for the legislature to make such laws and regulations, governing the subject of lobster-culture, oyster-culture, clam-culture, or any other kind of pisciculture, as they may deem expedient. They may regulate the public or private fisheries. They may even prohibit free fishing for a time and for such times as in their judgment it is for the best interest of the State so to do. They may withhold from the public use such natural oyster beds, clam beds, scallop beds or other fish beds as they may deem desirable. They may make a close time within which no person may take shell-fish or other fish, and generally they have complete dominion over fisheries and fish as well as all kinds of game. We find no limitation, in the constitution, of the power of the General Assembly to legislate in this regard, and they may delegate the administration of their regulations to such officers or boards as they may see fit." And in the case of *State* v. *Nelson, Ibid*, 264, 270, we held that the legislature has plenary power in the premises.

There are many things that cannot be done directly by the inhabitants of the State. The framers of the constitution recognized the fact that the elective franchise could not be exercised by all of the people of the State, and therefore provision was made in the constitution of the State for electors who should have the right to vote as therein prescribed, and Article II of the Constitution is devoted to the purpose of prescribing the qualifications of electors. Among the

prime requisites therein enumerated are those of citizenship and residence in the State for a period of one year, in the case of real estate voters, and two years in all other cases. These constitutional provisions are not only indicative of the will of the people in this particular, but may well serve as a guide to the legislature in the consideration of cognate subjects concerning which the constitution is silent. A citizen is one who owes allegiance to the State, is interested in its welfare and therefore is entitled to receive especial consideration from the State. Electors are particularly favored. Const. Art. IX, sec. 1. "No person shall be eligible to any civil office (except the office of school committee), unless he be a qualified elector for such office." Even in the law regulating the sale of intoxicating liquor, which can hardly be said to be the exercise of a State franchise, licenses can only be granted to citizens resident within the State. Gen. Laws, 1909, cap. 123, sec. 2. We have already seen that it is impossible for every one of the people of the State personally to exercise the franchise of fishing for lobsters in the public waters of the State, and that if such fishing is to be done for all it must be done by agents in order that the people may receive the benefits thereof. It is also clear that the fishery must be regulated in such a manner as not to exhaust the supply of lobsters; that the mode and method of such regulation is a matter solely for the consideration of the general assembly, and that their action in the premises is not subject to review except upon constitutional grounds. We are of the opinion that in the consideration of the subject the legislature might well follow the precedent established in the constitution in regard to the qualification of electors and make citizenship and residence within the State essential qualifications for the agents to be licensed to fish for lobsters upon the public fishing grounds. The public fishing grounds are limited in extent and area and the territory within such limits is subject to the control of the general assembly. All persons, citizens and aliens, residents and non-residents alike, must obey the laws enacted

by the legislature relative thereto. The territorial limits and jurisdiction of the State are defined in Gen. Laws, 1909, cap. 1, §§ 1 and 2,· as follows: "Section 1. The territorial limits of this state extend one marine league from its seashore at high-water mark. When an inlet or arm of the sea does not exceed two marine leagues in width between its headlands, a straight line from one headland to the other is equivalent to the shore-line. The boundary of counties bordering on the sea extends to the line of the state, as above defined. Sec. 2. The jurisdiction of the state shall extend to, and embrace, all places within the boundaries thereof, except as to those places that have been ceded to the United States, or have been purchased by the United States with the consent of the state." Over the vast domain without the territorial limits above defined, the state has no jurisdiction and the legislature no control and the hardy fishermen of all countries whether from New England or the Ionian Isles may freely fish upon the shoals and ledges beneath the boundless sea for the crustaceans that may there be found, without let or hindrance. No attempt has been made in the statute under consideration to impose restrictions upon them outside of the public fishing grounds of the state. Without doubt the rights of free fishery, above alluded to, have been and will continue to be freely exercised with gain and profit, dearly-earned and well-deserved. On the vast highway of nations there is ample room and verge enough to exercise the trade of fishing to their hearts content; either in the capacity of employer or employed and no question of citizenship or residence can arise to disturb them.

In these circumstances we are unable to perceive that the rights of any person have been infringed. On the contrary, it seems to us that the greatest good of the greatest number will be advanced by the legislation complained of. We are therefore of the opinion that the constitutional questions aforesaid must be severally answered in the negative. We do not find that any of the requirements of the Constitution

(5) of the United States or of the Constitution of this State, referred to in the questions certified to us, have been violated by the provisions of Pub. Laws, cap. 437, secs. 1 and 2 (passed May 7, 1909). So far as appears in these cases no duly qualified citizen has been refused a license to fish for the people's lobsters in the public waters of the State. For aught that appears all qualified applicants for such fishing licenses have received them. We are of the opinion that the enactment of the statute in question was a proper exercise of the police power by the legislature of the State, in a matter concerning only the people of the State, and that it was entirely unnecessary for the legislature to consider what effect the statute under consideration would have upon aliens, or even upon the citizens of other states, because it merely involved the conservation of one species of shellfish in the public waters of the State, a purely local natural resource, and that the legislature has full discretion to prescribe the modes and methods to be followed in the accomplishment of such conservation.

Having thus decided the questions certified to us, the papers in each case with our decision certified thereon will be sent back to the District Court of the First Judicial District for further proceedings.

BLODGETT, J., dissenting. Freely conceding that the General Assembly may pass appropriate legislation regulating the lobster fishery of this State, I am unable to agree with the opinion of the majority, that the statute under consideration is a proper exercise of that power, in certain particulars.

It is undoubtedly competent for the legislature to establish a close season as also to determine the size of the lobster which may be lawfully taken and although this court might be of opinion that the close season should be longer or shorter in duration, or that the size established by law should be greater or less, yet, inasmuch as both of these matters have relation to the regulation of the lobster fishery, we should doubtless hold them to be matters of legislative

discretion and not subject to judicial review. But if in addition the General Assembly should pass a law that licenses to take lobsters should be granted only to men having red hair the limit of legislative power would be surpassed. To my mind the restriction of licenses under this act, as provided in section 2 thereof, is legislation precisely of that character.

Section 2 is as follows: "SEC. 2. The commissioners of inland fisheries may grant or refuse to grant licenses to catch and take lobsters from the waters within the jurisdiction of this state (in the manner, at the times, and subject to the regulations provided in this act) to such citizens of this state as have resided in this state for at least one year next preceding the granting of such license as they may think proper." . . . In other words, it is a power of arbitrary classification, subject to no judicial review, and in no wise related to the promotion or protection of the fisheries or to the welfare of the people. While it is unquestionably true that the commissioners of inland fisheries are, by the above provision, invested with an absolute, arbitrary and discretionary power to grant or refuse licenses to such citizens as they may think proper without any restriction imposed by law, no test of fitness is prescribed by the statute as a criterion to guide the commissioners in issuing licenses and no appeal from the action of the commissioners is provided for. They are clothed with absolute and final authority to determine the particular citizens of Rhode Island who may engage in the lawful occupation of lobster fishing. The commissioners may deem it proper to refuse licenses to citizens of this state who have resided here for more than one year if such citizens are of foreign rather than of native extraction, or if such citizens profess a religious creed obnoxious to the commissioners, or if such citizens are of a particular nationality, race or color, or if such citizens are members of an opposing political party. In other words the personnel of the lobster fishermen of this state may be determined by whim and caprice of five men, the exercise of whose discretion is not hampered by any legal restraint.

The condemnation of the Supreme Court of the United States is explicit as to such powers. In *Yick Wo* v. *Hopkins*, 118 U. S. 356, 366, in which the court determined that certain municipal ordinances of the City of San Francisco ostensibly enacted to govern and regulate the use of wooden buildings as laundries were really passed to discriminate against Chinese laundrymen. The court says: "They seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. So that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of *mandamus*, to require the supervisors to consider and act upon his case, it would be a sufficient answer for them to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility. The power given to them is not confided to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint."

But the unlimited and uncontrolled discretion of the commissioners is not the sole or even the fundamental vice of the act. I find no power granted to the legislature to make such an arbitrary discrimination between citizens of this state who have resided here more than one year and other citizens of this state. It seems to be assumed rather than asserted in the majority opinion that these persons only are interested in the welfare of the state and include within their number only those who can be safely trusted to observe the law in this respect. The contention is without foundation. A citizen and an elector are not interchangeable terms and this act makes eligible for a license not only every infant, male or female, more than one year old,

native born or naturalized, domiciled in this state, but also every thug and every thief in the community, native born or naturalized, who has managed to elude the vigilance of the police long enough to acquire a domicile of one year in this state, and even every lunatic, pauper and convict of the same description. In other words, there is no crime known to the calendar, no past criminal record, or other disqualification of any kind provided that the applicant possesses citizenship and has resided here one year. However virtuous the life of a full grown man may have been in the past, even though he be one of the taxpayers who contribute to the expense of enforcing this law and the appropriation for this commission, he is absolutely disqualified from holding a license and from engaging in this calling, until he has resided here at least one year; while, on the other hand, a female infant, native born or naturalized, more than one year of age is eligible to receive such license and this distinction is sought to be justified as legislation for the protection of the public and the promotion of the lobster fishery.

The fallacy of the position is found apparent in another aspect. In *Attorney-General* v. *Police Commissioners*, 30 R. I. 212, this court held that corporations created by the General Assembly for the purpose of conducting liquor business are "citizens resident within this state." What possible justification can there be requiring a corporation to have existed one year before it is eligible to a license to carry on lobster fishery?

Section 1 of the act is as follows: "Section 1. No person, either as principal, agent, or servant, shall, at any time, catch or take any lobster from any of the waters in the jurisdiction of this state, or place, set, keep, maintain, supervise, lift, raise, or draw in or from any of said waters, or cause to be placed, set, kept, maintained, supervised, lifted, raised, or drawn in or from any of said waters, any pot or other contrivance designed or adapted for the catching or taking of lobsters, unless licensed so to do as herein-

after provided. Every person who shall violate any of the provisions of this section shall be fined twenty dollars or be imprisoned not more than thirty days, or both, for each such offence."

What is prohibited by the act; where is the prohibition effective and against whom is it directed. — It will be observed that the act prohibits much more than the catching or taking of lobsters, and that it is equally a violation of the act to "place, set, keep, maintain, supervise, lift, raise or draw in or from any of said waters." . . . "any pot or other contrivance designed or adapted for the catching or taking of lobsters." What are the waters referred to above as the "said waters" which are described twice in section 1 and once in section 2 as "waters within the jurisdiction of this state?" They are certainly not the waters in which the lobster has a habitat. It is equally an offence to lift or draw a pot from the tide water under the Great Bridge in the City of Providence, which is so impure that no lobster could live in it, as it is to perform a like act anywhere upon the coast of this state. To create this offence it is not essential that any lobster be taken. It is not necessary that any lobster ever be found at or near the place where the lobster pot is placed; if the pot is placed, set, kept, maintained, etc., anywhere in the waters within the jurisdiction of this state the offence is complete. There is no exception in favor of fresh water streams or fresh water ponds, absurd as such an omission may be. The act is not limited to the public tide waters of the state. The expression above referred to is three times repeated and in view of the fact that the offence is complete when the lobster pot is placed in or removed from any water, whether a lobster is there or not, the law must be construed precisely as it is written.

It is evident that there are two classes of offences defined in this section. The first of these is committed whenever a lobster is caught or taken whether by hand or net or in any other manner and this may properly be considered as a regulation of the lobster fishery. The second class of offences

is entirely different from the first and in no wise connected with it and may be considered as legislation for the protection of the lobster pot. For the commission of this offence it is not necessary that there should be any lobsters anywhere. An illustration drawn from the opinion of the majority of the court shows the difference. The estimated catch of 1909 was 1,575,000 pounds from 23,220 pots. This was the amount of the annual depletion of the supply of lobsters in this state at that time. If now we should suppose the entire 23,220 lobster pots now scattered along our coasts to be massed together in the tide water under the Great Bridge of the City of Providence, where the water is so defiled that no lobster or other living thing can exist in it, the penalty is precisely the same as when the lobster supply was being diminished 1,575,000 pounds annually. Absurd as this may seem it is only one of the many absurdities of this act. If the offence is the same whether there are any lobsters taken, or even exist, it is evidently immaterial whether there is too great a proportion of sewage or too small a proportion of brine in the waters in question.

The foregoing objections are not considered in the majority opinion, much less answered. It is, indeed, difficult to speak in terms appropriate to a judicial opinion of such legislation. It is so obviously arbitrary and without reference either to the regulation of the fisheries or the protection of the people that it should not receive judicial approval. It is, of course, too obvious for argument that if citizens of this state who have resided herein less than one year possess certain constitutional rights with respect to participation in the fisheries, such rights can not be abridged nor denied, under the plea that otherwise it becomes difficult to enforce the law against non-residents.

Raftak, by his plea that he is a citizen of Rhode Island who has resided here less than one year, has directly raised these questions. I cannot agree with the statement contained in the majority opinion that so far as appears in these cases,—"no duly qualified citizen has been refused a license

to fish for the people's lobsters in the public waters of the state. For aught that it appears all qualified applicants for such fishing licenses have received them." If that statement be correct there are no cases pending before this court. The contrary, however, is the fact and against the enforcement of this statute which is in no wise connected in the particulars enumerated either with the protection of the lobster fisheries or protection of the public, these respondents have severally appealed to this court. The questions raised on their appeals can neither be evaded or ignored and in my opinion they should not appeal in vain.

Neither in this provision nor in the section relative to the granting of licenses is there any relation whatever to the protection of the lobster. There is no restriction as to the number which one may take at any given period or the number of pots which a man may set. If he be fortunate enough to do so the individual licensee may secure for his own benefit every lobster which has been raised by the fish commission and liberated in our waters at the annual expense shown in the majority opinion and he may sell all such lobsters outside the jurisdiction of the state. The lobster fishery is thus unprotected in the slightest degree except by the provision concerning a close time and size. The people of the state receive no benefit because of the cheapened cost of lobsters or their greater abundance. The sole beneficiary is the fortunate licensee, who by the favor of the commission and at the expense of the taxpayer, is thus enabled to make a profitable calling.

It is intimated in the statement of the majority opinion that "over the vast domain without the territorial limits above defined, the state has no jurisdiction and the legislature no control and the hardy fishermen of all countries whether from New England or the Ionian Isles may freely fish upon the shoals and ledges beneath the boundless sea for the crustaceans that may there be found, without let or hindrance. No attempt has been made in the statute under consideration to impose restrictions upon them outside of the public

fishing grounds of the state. Without doubt the rights of free fishery, above alluded to, have been and will continue to be freely exercised with gain and profit, dearly-earned and well-deserved. On the vast highway of nations there is ample room and verge enough to exercise the trade of fishing to their hearts content, either in the capacity of employer or employed and no question of citizenship or residence can arise to disturb them." It is hardly necessary to state that this privilege is either valuable or worthless. If there are no lobsters elsewhere than within our waters the privilege to fish for them elsewhere is of no value; if they are in such abundance elsewhere restrictive legislation of this kind would seem to be unnecessary. A lobster is different from the clam and oyster; it travels and moves about very freely and is not confined to a bank or a bed.

In conclusion I am of the opinion that the test prescribed for eligibility to hold a license under this act is entirely unconnected with the protection of the lobster fishery or protection of the people. It is a purely arbitrary requirement of the legislature and is as obnoxious to the just requirements of legislation in that respect as would be the like requirement that a man have red hair; and in respect of such limitation is wholly null and void.

*William B. Greenough,* Attorney General, for the State.
*Lyman & McDonnell, Richard E. Lyman,* of counsel.
*Barney & Lee,* for defendants.
*Walter H. Barney, Theodore P. Ion,* of counsel.