THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JOHN BRENNAN, Appellant.

County Court, Nassau County, December 10, 1931.

*Louis M. Wolf*, for the appellant.

*Alfred T. Davison* and *Marcus G. Christ*, for the village of Saddle Rock, *amici curiæ*.

BONYNGE, J. The difficulty of the questions presented for decision upon this appeal is wholly out of proportion to the trifling amount involved.

Former section 90 of the Village Law contained an enumeration of the powers of the board of trustees of a village. By chapter 253 of the Laws of 1918 the Legislature added a new subdivision to this section reading as follows:

" 17-a. Taking fish bait from shore. To prevent a nonresident of the village taking fish bait from shores within or bounding upon the village without a license from the board of trustees; but before such ordinance shall be effective it shall be approved by resolution of the board of supervisors of the county within which such village is located."

Thereupon the trustees of the village of Saddle Rock adopted an ordinance forbidding any non-resident of the village from digging sand worms within its boundaries " without first obtaining a license." This ordinance was later approved by the board of supervisors of the county of Nassau. The village lies wholly within the boundaries of said county.

In June, 1931, the defendant, a resident of Queens county, was apprehended in the act of digging sand worms between high and low-water marks on the shores of Little Neck bay within the corporate limits of said village. As the defendant had failed to obtain a license from the village trustees, he pleaded guilty to the information and was fined fifty dollars, with the alternative of ten days in the county jail. The fine was subsequently paid.

Upon this appeal the appellant attacks the judgment of conviction on two grounds, viz.: (1) That the ordinance became inoperative through the repeal of parts of former section 90 of the Village Law, and (2) that both the ordinance and the act of the Legislature pursuant to which it was promulgated are discriminatory and, therefore, unconstitutional.

The first ground of attack is manifestly untenable. Although the Legislature repealed subdivision 17-a of section 90 of the Village Law in 1927 (Laws of 1927, chap. 650), it immediately enacted other provisions of substantially equal scope (Village Law, § 89, subd. 59, and § 90). Under familiar rules of construction, the village ordinance, if valid, continued to be operative. (Gen. Constr. Law, §§ 93, 95.)

The constitutional question, however, does not yield so readily. Counsel have cited a number of authorities holding that a State may, in the matter of taking fish and game, discriminate in favor of its own citizens and against the citizens of other States. (*People* v. *Lowndes*, 130 N. Y. 455; *McCready* v. *Virginia*, 94 U. S. 391.) The Legislature of New York has given effect to this distinction by requiring a non-resident to pay ten dollars for a hunting license, whereas a resident may obtain one for a fee of two dollars. (Conservation Law, § 185, subd. 3, as amd. by Laws of 1930, chap. 364.) The principle, so far as discrimination against a non-resident of the State is concerned, may be regarded as settled, but the question here cuts deeper and involves the right of the State to practice

discrimination as between its own citizens. There is apparently no controlling decision in this State on the subject and the authorities in other jurisdictions are in hopeless conflict. (See *Commonwealth* v. *Hilton*, 174 Mass. 29; *State* v. *Leavitt*, 105 Me. 76; *Harper* v. *Galloway*, 58 Fla. 255; *State ex rel. Clarkson* v. *Philips*, 70 id. 340; *Lewis* v. *State*, 110 Ark. 204; *State* v. *Barkley*, 192 N. C. 184; *State* v. *Higgins*, 51 S. C. 51; *Gustafson* v. *State*, 40 Tex. Crim. 67; *State* v. *Hill*, 98 Miss. 142; 53 So. 411.)

The view that the attempted discrimination is unconstitutional can readily be summarized. Section 1 of article 1 of the State Constitution provides that " No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers." In *People* v. *Bootman* (180 N. Y. 1) the court said: " The game and fish within the boundaries of the State belong to the people in their unorganized capacity and may be taken by any citizen without fee or license at any time during the open season." To the same effect see Conservation Law (§ 175, added by Laws of 1912, chap. 318) and *Geer* v. *State of Connecticut* (161 U. S. 519). The right of the public to use the foreshore for passing, repassing, fishing, bathing and purposes of navigation is open to no manner of doubt. (*Tiffany* v. *Town of Oyster Bay*, 234 N. Y. 15, and cases there cited.) Close adherence to the foregoing principles would apparently lead to the conclusion that both the act and the ordinance were unconstitutional. But while the question is by no means free from doubt it seems to me that their constitutionality can and should be upheld upon the following grounds:

*First.* A court of limited or inferior jurisdiction is justified in overriding acts of the Legislature only in the clearest cases. (*People* v. *Beakes Dairy Co.*, 222 N. Y. 416; *People ex rel. Carter* v. *Rice*, 135 id. 473; *Gardner* v. *Ginther*, 232 App. Div. 296.) It cannot fairly be said that the instant case presents any such elements of clarity.

*Second.* In *People* v. *Thompson* (30 Hun, 457) it appeared that the Legislature had, by chapter 734 of the Laws of 1868, authorized any inhabitant of the towns of Gravesend and Flatlands to plant oysters under the public waters within their respective towns and to have the exclusive right in the oysters so planted and the exclusive use of the beds. Permission to plant such oysters was to be granted only by a justice of the peace and the supervisor of the town. The defendant, a non-resident of the town, was indicted for a misdemeanor in removing oysters from a planted bed. The court held that the State could properly exercise this power through the town officials and said: " Besides these the State is really by

this act following a policy for the promotion of the public good and the benefit of all its inhabitants. It is encouraging oyster culture, affording special inducements to those who will engage in the industry upon the public domain. It protects them from annoyance and intrusion by others upon the special field of their operations — the bottom. It is simply a police regulation, at most an exercise of police power."

In the case just cited the defendant justified his action on the ground that he was raking clams on a natural clam bed and not taking the oysters of the complainant. In answer to this contention the court said: "The State might well prefer to encourage the planting of oysters, rather than to preserve natural clam beds, and that is an essential feature of the bed in question."

Although the case presented an example of discrimination of the clearest kind, its authority has seemingly never been questioned. Other authorities bearing on this same general subject are *Fleet* v. *Hegeman* (14 Wend. 42); *Smith* v. *Levinus* (8 N. Y. 472); *Town of Brookhaven* v. *Smith* (188 id. 74), and *People* v. *Lowndes* (130 id. 455).

*Third.* The rights of the public in the foreshore are of a restricted nature and include only passing, fishing, bathing, hunting and navigation. In none of these activities is there any disturbance of the soil. Sand worms, however, can be obtained only by digging — oftentimes to a considerable depth. In the case at bar it is claimed that such digging on the shores of Little Neck bay has undermined the sea walls, although there is nothing in this record to substantiate the contention. Does the right of the public go the distance of permitting an actual disturbance of the soil? In *Johnson* v. *May* (189 App. Div. 196, a decision by the Second Department) it was held that a bather could not lawfully drive four stakes in the ground for the purpose of erecting a temporary sun shelter. In the strong dissenting opinion of Mr. Justice DAVIS in *Stewart* v. *Turney* (203 App. Div. 486) the right of a hunter to erect a temporary blind between high and low-water marks was denied.

*Fourth.* It has long been settled law that the public cannot gather seaweed from the foreshore. (*Parsons* v. *Miller*, 15 Wend. 561; *Nolan* v. *Rockaway Park Imp. Co.*, 76 Hun, 458; *Emans* v. *Turnbull*, 2 Johns. 313; 45 C. J. 507.) These cases sustain the view that the public right in the foreshore is both qualified and narrowly restricted.

*Fifth.* The lack of perfect equality or symmetry in the law does not condemn it. The police power of the State does not always operate with the precision of a fine tool. As Mr. Justice HOLMES

said in the somewhat analogous case of *Patsone* v. *Pennsylvania* (232 U. S. 138): " The discrimination undoubtedly presents a more difficult question. But we start with the general consideration that a State may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named."

It may be doubted whether the discrimination in the case at bar is any more apparent than that sustained in *People* v. *Havnor* (149 N. Y. 195).

*Sixth.* Principles governing the rights of the public in the land between high and low-water marks have their roots in ancient times and primitive conditions. With the improvement of the gasoline engine and the consequent increase of traffic by land and sea, the owner of waterfront property is now subject to constant attack from both front and rear. To minimize this the Legislature has appropriated vast sums to provide shore front playgrounds which are freely placed at the disposal of all the people. A very substantial part of this burden of expense has fallen upon the inhabitants of Nassau county. Conceivably the Legislature had these conditions in mind in delegating some measure of authority in such matters to the trustees of incorporated villages. As was said by the Court of Appeals in *Klein* v. *Maravelas* (219 N. Y. 383): " The needs of successive generations may make restrictions imperative to-day which were vain and capricious to the vision of times past."

*Seventh.* When reduced to its final analysis, the present trend toward the incorporation of small communities as villages, springs from a desire for the seclusion and privacy no longer attainable in the cities. While the fish and game of the State belong to all of the people dwelling therein, the right of the State to establish game sanctuaries, private parks and preserves has nevertheless been upheld. (*Rockefeller* v. *Lamora*, 85 App. Div. 254; Conservation Law, §§ 360 *et seq.*, as amd.) In principle the withdrawal of the sand worms of an incorporated village from the public domain stands upon the same footing. Moreover it is not beyond the bounds of possibility that the Legislature may have recognized man's need

of a sanctuary as no less compelling than that of the wild life of the State.

The appellant calls attention to an unreported decision by Judge SMITH, formerly of this court, in *People* v. *Tyndall*. In that case it appeared that the trustees of the town of North Hempstead had adopted an ordinance forbidding the digging of sand worms by non-residents of the town and the learned judge held this ordinance discriminatory and invalid. The case is readily distinguishable upon the ground that the trustees of the town, unlike the village trustees in the instant case, acted without any express grant of power by the Legislature.

The judgment of conviction is affirmed.