[L. A. No. 19835.   In Bank.   ·Oct. 17, 1947.]

TORAO TAKAHASHI, Respondent, v. FISH AND GAME
COMMISSION et al., Appellants.

720

Robert W. Kenny and Fred N. Howser, Attorneys General, and Ralph W. Scott, Deputy Attorney General, for Appellants.

A. L. Wirin, John Maeno and Saburo Kido, Wirin, Kido & Okrand for Respondent.

Arthur Garfield Hays, Richard Hawkins, Frederick Sussman, Isaac Pacht, Morris Cohn, Robert Morris, Clore Warne, Hugh Macbeth, Jr., Herbert Ganahl, Daniel S. Marshall and William Strong as Amici Curiae on behalf of Respondent.

EDMONDS, J.—The superior court granted a peremptory writ of mandate directing the Fish and Game Commission to issue to the petitioner, Torao Takahashi, an alien ineligible to citizenship of the United States, a commercial fishing license. Upon its appeal from the judgment, the commission asserts that section 990 of the Fish and Game Code, which declares that a license shall not be granted to such an alien, is controlling. The constitutionality of that statute is the only question for decision.

In his amended petition, Takahashi alleges that since 1915, and until 1941, he was a duly licensed commercial fisherman, engaging in that occupation on the high seas. He was evacuated from California by military order in 1942. Upon his return to California in 1945, petitioner asserts, he qualified to obtain a fishing license within all of the requirements of the California Fish and Game Code "except only that he is a person of Japanese descent." The commission then refused to issue a license to him "solely because of his Japanese ancestry," and "solely because of the provisions of Section 990 of the Fish and Game Code." This provision is unconstitutional on its face, and as applied to him, says Takahashi, because it was enacted for the purpose of discriminating against persons solely because of race, and is being administered in furtherance of that purpose. The bar of the statute, therefore,

denies him due process of law as guaranteed by the state and federal Constitutions and the equal protection of the laws as guaranteed by the federal Constitution. The remedy of mandamus is invoked, the petition concludes, because he has no adequate or any remedy at law or in any other proceeding. The relief sought is a peremptory writ requiring the commission to issue to him a commercial fishing license "to engage in commercial fishing on the high seas."

By its answer, the Fish and Game Commission denies that it refused Takahashi a license because of his Japanese ancestry. Upon information and belief, it asserts that he is ineligible to citizenship of the United States and, for that reason, it is not authorized or empowered under the applicable statute to issue a license to him. The remaining allegations of the petition are denied generally, specifically, or upon information and belief. As separate defenses, the commission alleges that the petition does not state facts sufficient to constitute a cause of action; that Takahashi is not qualified to receive or to have issued to him a commercial fishing license under the provisions of section 990 of the Fish and Game Code; and that he has no legal capacity to sue.

A demurrer to the petition was overruled. Petitioner then moved for a peremptory writ, the matter came on for hearing upon the pleadings, and judgment was rendered in his favor. By this judgment, the court found that Takahashi, although "a person ineligible to citizenship in the United States, . . . is qualified to have issued to him a commercial fishing license, under the provisions of section 990 . . . authorizing him to bring ashore in California, for the purpose of selling the same in a fresh state, his catches of fish from the waters of the high seas beyond the State's territorial jurisdiction."

The commission perfected its appeal from this judgment and the transcript was filed within rule time. A few days later, the superior court, on application of Takahashi, entered an amended judgment directing that, by a peremptory writ of mandate, the commission be ordered to issue to him a commercial fishing license. Under the terms of the amended judgment and the amended peremptory writ of mandate, the commission is required to issue a license to Takahashi permitting him to fish commercially in territorial waters of the state as well as on the high seas.

In aid of appellate jurisdiction, the commission filed a notice of appeal from the amended judgment. By stipula-

tion, the record on appeal was augmented to include the notice of appeal from the amended judgment, the affidavit of Takahashi and the original and amended order made under section 1110(b) of the Code of Civil Procedure, the amended judgment granting the peremptory writ of mandate, and the amended peremptory writ of mandate. The amended order made under section 1110(b) provides that the appeal taken from the judgment of the superior court granting the writ of mandate ''shall not operate as a stay of execution of said judgment.'' Upon application of the commission, this court granted a writ of supersedeas staying proceedings upon both judgments until the determination of the appeal.

The commission, represented by the attorney general, does not question the validity of the amended judgment upon the ground that it was rendered after the appeal was perfected because the parties desire to have a decision upon the basis of its provisions. Also, the appellant does not now rely upon its separate defense that Takahashi has no legal capacity to sue.

Turning to the merits of the controversy, the commission contends that fish, like game, is the property of the state and held by it in its sovereign capacity as a trustee for all of its people; therefore, an individual cannot obtain an absolute property right in fish or game except upon such conditions, restrictions and limitations as the state may impose. It is well established, the argument continues, that the state, in the interest of conservation, may confer exclusive rights of fishing and hunting on its own citizens and, without violating constitutional inhibitions, expressly exclude aliens and non-resident citizens. The state may further classify aliens into two groups, those who are and those who are not eligible for citizenship, and such legislation is presumed to be constitutional. The reduction of the number of persons eligible to fish bears a reasonable relation to the object of conservation of fish and is within the purview of the state's police power; therefore, the classification is a reasonable one. And the inherent power of the state to regulate fish and game applies to fish brought into the state from the high seas by an ineligible alien.

Concerning the question as to whether the statute is being administered so as to discriminate against the Japanese, the commission relies upon the fact that no proof was offered by Takahashi in support of his allegation in that regard. For that reason, says the appellant, the allegations of the answer

must be taken as true. The court may not take judicial notice that Japanese are the only ineligible aliens who engage in commercial fishing in ocean waters bordering California, and there is no basis for a conclusion that there was unconstitutional discrimination against Japanese aliens by description rather than name in the 1945 amendment to section 990. Nor may the court take judicial notice of alleged discrimination, as found in certain reports made by a committee of the California Senate and other articles. In conclusion, the commission argues that section 990 of the Fish and Game Code does not divest Takahashi of rights under the treaty with Japan, because that treaty was abrogated in 1940.

Takahashi claims that section 990 of the Fish and Game Code is unconstitutional. Because it constitutes discriminatory race legislation, he argues, it violates due process as guaranteed by the California and United States Constitutions, and denies equal protection of the laws in violation of the federal Constitution. More specifically, he contends that the legislative history of section 990 discloses that this legislation was and is aimed exclusively at persons of the Japanese race. And even if fishing in territorial waters is a privilege granted by the state, rather than a right, the state may not unconstitutionally discriminate because of race, in the grant of that privilege. In support of this claim Takahashi contends that the court should take judicial notice of certain facts; namely, that it was known to the Legislature in 1945 that Japanese were the only aliens ineligible to citizenship who engaged in commercial fishing in California waters and that certain articles and Senate reports show discrimination against this race. The alien also argues that the decisions construing the alien land law are not controlling in the present controversy because they do not concern the right to follow an occupation, and the statute concerning real estate has not been challenged as one aimed exclusively against any particular race.

An appeal removes from the jurisdiction of the trial court the subject matter of the judgment or order appealed from, including all issues going to the validity or correctness of such judgment or order. The trial court has no power thereafter to amend or correct its judgment or order, or to vacate or to set it aside. Such power cannot be reinvested in the trial court even by the consent of the parties. (*Linstead*

v. *Superior Court,* 17 Cal.App.2d 9 [61 P.2d 355]; *Kinard* v. *Jordan,* 175 Cal. 13 [164 P. 894]; *Parkside Realty Co.* v. *MacDonald,* 167 Cal. 342 [139 P. 805].) ▪ The amended judgment is, therefore, void, but an appeal may be prosecuted from it as a "special order made after final judgment," for the purpose of having the determination reviewed and reversed. (Code Civ. Proc., § 963, subd. 2; *Ivory* v. *Superior Court,* 12 Cal.2d 455, 460 [85 P.2d 894]; *Luckenbach* v. *Krempel,* 188 Cal. 175, 177 [204 P. 591]; see 2 Cal.Jur., Appeal and Error, § 40.)

Section 990 of the Fish and Game Code requires "every person who uses or operates or assists in using or operating any boat . . . to take fish . . . for profit," or who brings fish ashore "at any point in the State for the purpose of selling the same in a fresh state," to procure a commercial fishing license. Such a license "may be issued to any person other than a person ineligible to citizenship." This section was first codified in 1933 (Stats. 1933, ch. 73; based on Stats. 1909, ch. 197, as amended). At the same session of the Legislature, the section was amended (Stats. 1933, ch. 696), and contained a restriction against persons who had not lived in the United States for one year. This restriction was held unconstitutional in *Abe* v. *Fish & Game Commission,* 9 Cal. App.2d 300 [49 P.2d 608]. The hunting license section (427) of the Fish and Game Code, prior to 1945 and at the present time, classifies persons, for the purpose of imposing fees, as those under and over the age of 18 years, citizen residents of this state, nonresident citizens, resident declarant aliens, and those who have not declared their intention of becoming citizens. Section 428 of the same code, relating to sport fishing licenses, also classifies persons into groups of those over and under 18 years, residents and nonresident citizens of the United States, and aliens. In 1943 (Stats. 1943, ch. 1100), these sections were amended and "alien Japanese" were singled out by name as the only persons not qualified for a license to hunt, or fish for pleasure or profit. However, in 1945 (Stats. 1945, ch. 181), each of these sections was amended so as to deny an alien "ineligible to [United States] citizenship" the privilege of obtaining either a hunting, sport fishing or a commercial fishing license.

▪ The Fourteenth Amendment to the federal Constitution is not confined to the protection of citizens. It applies to all persons within the territorial jurisdiction, without regard

to differences of race, creed, color or nationality. (*In re Kotta,* 187 Cal. 27 [200 P. 957]; *Truax* v. *Raich,* 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131, Ann.Cas. 1917B 283, L.R.A. 1916D 545]; *Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]; *Wormsen* v. *Moss,* 177 Misc. 19 [29 N.Y.S.2d 798].) The equality guaranteed is equality under the same conditions, and among persons similarly situated. ■ However, the Legislature may make a reasonable classification of persons and businesses and pass special legislation applying to certain classes. ■ The rule is that the classification shall not be arbitrary, but must be based upon some difference in the classes having a substantial relation to a legitimate object to be accomplished. (*Watson* v. *Division of Motor Vehicles,* 212 Cal. 279 [298 P. 481]; *Pacific Indemnity Co.* v. *Myers,* 211 Cal. 635 [296 P. 1084]; *Superior etc. Corp.* v. *Superior Court,* 203 Cal. 384 [264 P. 488]; *In re Kotta, supra;* *Gulf etc. Co.* v. *Ellis,* 165 U.S. 150 [17 S.Ct. 255, 41 L.Ed. 666].)

■ As stated in *Wormsen* v. *Moss, supra,* ". . . the free right to labor is subject to the qualification that the right may be interfered with by the State, in the exercise of its general police power, in the interests of the health, morals, safety or welfare of the community. Such action of the State must, however, be reasonable, bear a just and reasonable relation to the promotion of the general welfare, and avoid arbitrary discrimination between persons. A statute enacted in the exercise of the police power must have been passed to prevent some manifest evil or to preserve public health, morals, safety or welfare. . . . If the calling is one that the State, in the exercise of its police power, may prohibit either absolutely or conditionally, by the exaction of a license, the fact of alienage may justify a denial of the privilege. But even then, there must be some relation between the exclusion of the alien and the protection of the public welfare." (29 N.Y.S.2d 801, 803.) ■ Stated another way, the test of the constitutionality of legislation denying aliens the right to obtain a license to pursue a business is whether the classification has some reasonable basis in the welfare of the community. (*Miller* v. *City of Niagara Falls,* 207 App.Div. 798 [202 N.Y.S. 549].)

■ When a legislative enactment is attacked upon the ground of discrimination, all presumptions and intendments are in favor of the reasonableness and fairness of the legis-

lative action. The existence of facts supporting the legislative judgment is to be presumed and the burden of overcoming the presumption of constitutionality is cast upon the assailant.

The decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary. (*People* v. *Globe Grain & Mill Co.*, 211 Cal. 121, 127 [294 P. 3]; *People* v. *Monterey Fish Products Co.*, 195 Cal. 548, 556 [234 P. 398, 38 A.L.R. 1186]; *Alabama State Federation* v. *McAdory*, 325 U.S. 450, 465 [65 S.Ct. 1384, 89 L.Ed. 1725]; *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152 [58 S.Ct. 778, 82 L.Ed 1234].) The only possible limitation upon this rule is where the legislation attempts to restrict fundamental liberties. (See *United States* v. *Carolene Products Co.*, *supra*, p. 152; *Thornhill* v. *Alabama*, 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093].)

The statute now challenged regulates the bringing ashore in California of fish caught in territorial waters and on the high seas, and prohibits the issuance of commercial fishing licenses for either of these purposes to aliens ineligible to United States citizenship. It has long been held that the state is the owner of the fish in coastal waters and may regulate the taking of them for private use. ''The legislature may dispose thereof as to it may seem best, only subject to constitutional limitations against discrimination. Within those limitations the legislature, for the purpose of conserving and protecting fish, may pass such laws as to it seem wise, and the question what measures are best adapted to that end are for its determination . . . [citations]. . . . Such fish can become the subject of private ownership only in such qualified way, to such limited extent, and subject to such conditions and limitations as the state through its legislature may see fit to provide and impose.'' (*People* v. *Monterey Fish Products Co.*, *supra*, p. 563; see *In re Makings*, 200 Cal. 474, 481 [253 P. 918]; *People* v. *Glenn-Colusa Irr. Dist.*, 127 Cal.App. 30, 36 [15 P.2d 549]; *Bayside Fish Flour Co.* v. *Zellerbach*, 124 Cal.App. 564, 566 [12 P.2d 961].)

It is well established that the Legislature has the most extensive powers over the fish and game within its jurisdiction. (*In re Makings*, *supra*, p. 481.) The broad powers of the state in this regard were early established in *Ex parte Maier*, 103 Cal. 476 [37 P. 402, 42 Am.St.Rep. 129], where the court said, ''The wild game within a state belongs to the

people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good." (See *Lubetich* v. *Pollock,* 6 F.2d 237 and cases cited therein.)

The right of the state to confer exclusive rights of hunting and fishing within its borders upon its own citizens is, therefore, beyond question. Also, citizens of other states, aliens, and alien residents may be constitutionally denied the privilege. (*Lacoste* v. *Dept. of Conservation,* 263 U.S. 545 [44 S.Ct. 186, 68 L.Ed. 437]; *Patsone* v. *Pennsylvania,* 232 U.S. 138 [34 S.Ct. 281, 58 L.Ed. 539]; *Geer* v. *Connecticut,* 161 U.S. 519 [16 S.Ct. 600, 40 L.Ed. 793]; *McCready* v. *Virginia,* 94 U.S. 391 [24 L.Ed. 248]; *Lubetich* v. *Pollock, supra;* *In re Eberle,* 98 F. 295; *Cummings* v. *People,* 211 Ill. 392 [71 N.E. 1031]; *Commonwealth* v. *Hilton,* 174 Mass. 29 [54 N.E. 362, 45 L.R.A. 475]; *State* v. *Kofines,* 33 R.I. 211 [80 A. 432, Ann.Cas. 1913C 1120]; *People* v. *Setunsky,* 161 Mich. 624 [126 N.W. 844]; *State* v. *Leavitt,* 105 Me. 76 [72 A. 875, 26 L.R.A. N.S. 799]; *People* v. *Brennan,* [142 Misc. 225 [255 N.Y.S. 331]; *State* v. *Niles,* 78 Vt. 266 [62 A. 795, 112 Am.St.Rep. 917]; *Alsos* v. *Kendall,* 111 Ore. 359 [227 P. 286]; *State* v. *Maybury,* 136 Wash. 210 [239 P. 552].) The broad powers of the state in this regard are set forth in *Lubetich* v. *Pollock, supra,* where the court stated: "In the light of the foregoing authorities it seems unescapable that the state owns the food fish in the waters over which it has jurisdiction, the same as any other proprietor owns property, and that aliens and nonresidents of the state may be constitutionally denied the right to take fish within its borders. The power to make such disposition of the fish arises out of and is incidental to the ownership of the property." (6 F.2d 240.) Answering the contention that the Washington statute denied an alien the right to engage in a lawful occupation, the district court adopted with approval the following declaration by the Supreme Court of Oregon: "The rights of the state in the fish and in the waters from which the fish are to be taken are superior to plaintiff's right to choose fishing for salmon in those waters for an occupation. Such an occupation is not open to an alien against the legislative will of the state, since it involves the appropriation of property belonging to the

state in its sovereign capacity. The state, in prohibiting aliens from engaging in the taking of salmon fish, is dealing with the common property of the people of the state; in prohibiting citizens of other states and unnaturalized foreign-born residents from fishing in the public waters of the state the state is, in fact, dealing with a property right of the state, and not with a mere privilege or immunity of a citizen of another state, nor does it amount to a denial to an alien within the state of the equal protection of its laws. Under the police power of the state the Legislature may prescribe any terms or conditions reasonably necessary for the preservation of the fish, but in the enactment of this law the Legislature was not legislating under its police powers, but under its reserved powers as the owner of the property which was the subject of the legislation, and which was to be affected thereby. As such owner it was authorized to prescribe any terms or conditions upon which the property of the state might be converted into private ownership. In legislating to that end it was dealing with its own property, and it had all of the rights and powers of an individual owner subject only to the duties which it owed to its own citizens.'' Under the broad powers resting in the state in regard to the regulation of its fish and game as established by these authorities, it is clear that a state may withhold the privilege of hunting and fishing from aliens ineligible to United States citizenship.

This court recently held in *People* v. *Oyama*, 29 Cal.2d 164 [173 P.2d 794], that the Alien Land Law (Alien Property Initiative Act of 1920, Stats. 1921, p. lxxxiii, as amended; 1 Deering's Gen. Laws, Act 261) is constitutional. The broad powers of the state to regulate the ownership of real property within its boundaries were restated, and it was held that a state may prohibit, subject to a treaty to the contrary, the ownership of its lands by aliens ineligible to United States citizenship. The opinion points out that ''Upon the subject of equal protection,'' the United States Supreme Court in *Terrace* v. *Thompson*, 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255], ''held that the classification was reasonable, saying that the rule established by Congress on the subject of naturalization 'in and of itself, furnishes a reasonable basis for classification in a state law withholding from aliens the privilege of land ownership as defined in the act.' '' The basis of the classification regarding real estate is the same as the one upon which the statute here in controversy rests. By one

statute, the state prohibits the ownership of land by ineligible aliens. In the other enactment the Legislature has declared that such persons shall not take fish from its waters.

In many decisions the courts have upheld a classification of persons by which nonresidents and aliens were denied hunting and fishing privileges. Insofar as conservation is concerned, it is just as reasonable to classify aliens upon the basis of eligibility to citizenship. Obviously, if the Legislature determines that some reduction in the number of persons eligible to hunt and fish is desirable, it is logical and fair that aliens ineligible to citizenship shall be the first group to be denied the privilege of doing so. This is a logical, established, and reasonable method of classifying for conservation purposes, and the existence of facts supporting the legislative judgment is presumed. In view of the application of the presumption of constitutionality to legislation of this kind, and because of the broad powers of the Legislature in regard to the ownership, regulation and protection of wildlife, it may not be said that the refusal of the state to allow aliens ineligible to citizenship in the United States to take, or assist in the taking of, fish for private use is so palpably arbitrary as to deny such aliens constitutional guarantees. The broad ground of attack that section 990 violates Takahashi's rights under the treaty between the United States and Japan is entirely without merit, for that treaty was abrogated on January 26, 1940. (See *People* v. *Oyama, supra,* p. 174.)

Takahashi contends, however, that section 990 is unconstitutional because it was enacted for the purpose and administered in a manner to discriminate against persons, including petitioner, solely because of his race. He points to the statute as it stood before the 1945 amendment and claims that the same group was singled out in different terms. Certain legislative reports and articles are referred to. But Takahashi has not established with any certainty that the Legislature intended to discriminate against the Japanese by enacting the 1945 amendment to section 990. Certainly such discrimination does not appear upon the face of the amendment. All of the races ineligible to citizenship are included, and no one group in particular is singled out.

Prior to the 1945 amendment, section 990 expressly excluded alien Japanese, but this section was changed to exclude persons ineligible to citizenship. However, this does not conclusively show that the 1945 amendment was intended to be a

continuance of the exclusive ban on alien Japanese by description rather than by name. Just as reasonably it may be said that the history of the 1943 and 1945 legislation shows a legislative desire to avoid the possibility of Japanese racial discrimination by extending the prohibition to all persons within a given class. And the fact that the Legislature applied the phrase "ineligible to citizenship" to other subjects covered in the same chapter, including sport fishing and hunting, indicates that there was no intention to discriminate against alien Japanese commercial fishermen.

Nor do the reports referred to in Takahashi's briefs point unerringly to unwarranted discrimination. The Senate fact-finding committee reported merely that because the statute, as it read in 1943, might be declared unconstitutional, a change to the present form was desirable. By the amendment, it may be inferred, the Legislature desired to extend conservation measures and did not rewrite the statute for the purpose of discriminating against alien Japanese. Furthermore, such reports on their face represent the opinion of only a few of the legislative body and cannot, with any certainty, be said to express the intention of the Legislature as a whole. For much stronger reasons, articles in newspapers or other unofficial publications cannot be considered as statements of legislative intent.

Takahashi contends, as justifying judicial notice, that "it was commonly known to the legislators of 1945 that Japanese were the only aliens ineligible to citizenship who engaged in commercial fishing in ocean waters bordering on California." Although the scope of judicial knowledge has been amplified by the courts in recent years, certain limitations remain.

Courts may take judicial notice of facts that are regarded as forming a part of the common knowledge of every person of ordinary understanding and intelligence. However, such common knowledge must be certain and indisputable, and the matter should be within the court's jurisdiction. (*Varcoe* v. *Lee*, 180 Cal. 338, 346 [181 P. 223] ; see Code Civ. Proc., § 1875; *People* v. *Sanchez*, 21 Cal.2d 466 [132 P.2d 810] ; *Livermore* v. *Beal*, 18 Cal.App.2d 535 [64 P.2d 987] ; 31 C.J.S., Evidence, §§ 6 et seq.; 10 Cal.Jur. 693.)

Can it be said with certainty that Japanese were the only aliens ineligible to citizenship who engaged in commercial fishing in ocean waters bordering on California? And is the answer to this question a matter of common knowledge? The

"Fish Bulletins," compiled by the Bureau of Marine Fisheries, Division of Fish and Game, Department of Natural Resources, do not include such information. And it was stipulated that the Statistician of the Bureau of Marine Fisheries does not know how many aliens ineligible to United States citizenship applied for commercial fishing licenses during the past 15 years. At the time the 1945 amendment to section 990 was passed, the naturalization laws of the federal government prohibited Japanese, Hindus and Malayans from becoming citizens of the United States. The 16th census of the United States, taken in 1940, shows that California was populated by aliens other than Japanese who were also ineligible to citizenship, and it is reasonable to assume that some of those persons were, or might desire to be, engaged in fishing as an occupation.

When the Legislature acted in 1945, it did not change only the requirements in regard to commercial fishing. Sections 427 and 428, relating to hunting and sport fishing licenses, also were amended to prohibit the issuance of such licenses to ineligible aliens. If judicial knowledge is to be invoked, the intent of the Legislature of 1945 in enacting the changes in chapter 181 should be gathered from the whole chapter and not alone from the section relating to commercial fishing. To follow logically the contention of Takahashi would require the further assumption of judicial knowledge that Japanese are the only ineligible aliens who hunt or fish for pleasure in California. This, conclusion is again open to the objection of gross uncertainty. Under these circumstances, Takahashi has not sustained the burden of showing that the challenged statute is either unconstitutional on its face, or that it has been unconstitutionally applied to him.

This conclusion is not at variance with *Macallen Co.* v. *Massachusetts*, 279 U.S. 620 [49 S.Ct. 432, 73 L.Ed. 874], which held that a statute imposing a tax on federal securities was void notwithstanding the designation given to the legislation. Counsel for Takahashi use the Macallen case as authority for their position that if the 1943 amendment to section 990 barring alien Japanese by name from fishing and hunting was unconstitutional, so is the present statute, because, since 1945, the same group is now singled out by a more general designation. But it is established by both federal and state authorities that the state may properly deny the privilege of hunting and fishing to all except its own citizens, and the

record does not show that Japanese are the only ineligible aliens in this state who have hunted and fished.

Nor is *In re Ah Chong*, 2 F. 733, relied upon by Takahashi, controlling. In that case the court held unconstitutional an early California statute which prohibited aliens incapable of becoming electors of the state from fishing in inland state waters. This conclusion was placed upon the ground that the legislation was aimed solely at the Chinese. The statute was one of a series of constitutional provisions and legislative enactments, some of which singled out the Chinese by name, directed against a particular racial group. In those early days it was commonly known that the Chinese were the only aliens in California who could not become electors. It was thus evident from the extensive legislation and declared policy of the state, as embodied in its Constitution, that Chinese were being singled out not only by name but by description. The Ah Chong case, therefore, is clearly distinguishable on its facts from the issues now before the court. Also, in striking down the statute, the court did not consider the important rules in regard to the presumption of constitutionality; nor, apparently, did the state strenuously urge, as here, that the statute was enacted for conservation purposes.

Other cases cited by Takahashi do not compel a determination in his favor. In *Abe* v. *Fish & Game Commission, supra,* the court considered only the constitutionality of section 990 insofar as it prohibited nonresidents from bringing ashore in California fish caught on the high seas. The decision does not construe the statute insofar as it prohibits the issuance of territorial commercial fishing licenses to ineligible aliens. *Danskin* v. *San Diego Unified School District,* 28 Cal.2d 536 [171 P.2d 885], concerned the constitutionality of section 19432 of the Civic Center Act, which allows the governing boards of school districts to refuse the use of school buildings to "subversive elements." A majority of the court held the measure unconstitutional as an interference with freedom of speech and assembly upon the ground that, although a state may withhold the use of school property, it may not impose an arbitrary and unconstitutional requirement as a condition for granting the privilege. The statute now under attack imposes no unconstitutional requirement as a condition for a privilege.

Considering the provisions of section 990 in regard to the bringing ashore of fish caught beyond coastal waters, it is well established that the state, in the exercise of its police

power, may regulate and control the taking, possession and sale, or transportation of fish and game. This principle is applicable to sea products caught upon the high seas beyond the three-mile limit of state jurisdiction and sought to be brought into or transported over portions of the state which have been subjected to statutory regulations affecting the taking, possession, and sale of fish and other marine products. (*Johnson* v. *Gentry,* 220 Cal. 231 [30 P.2d 400] ; *Svenson* v. *Engelke,* 211 Cal. 500 [296 P. 281] ; *Ex parte Maier, supra; Silz* v. *Hesterberg,* 211 U.S. 31, 40 [29 S.Ct. 10, 53 L.Ed. 75] ; *Geer* v. *Connecticut, supra; Van Camp Sea Food Co.* v. *Department of Natural Resources,* 30 F.2d 111; *In re Deininger,* 108 F. 623.) This rule is not violative of the federal government's interstate commerce power. (*Ex parte Maier, supra,* p. 484; *Geer* v. *Connecticut, supra,* p. 534; *Silz* v. *Hesterberg, supra,* p. 43; *Van Camp Sea Food Co.* v. *Department of Natural Resources, supra,* p. 113.) The reason for upholding such a regulation or prohibition was stated in *Van Camp Sea Food Co.* v. *Department of Natural Resources, supra,* where the court said: "We entertain no doubt as to the validity of such restriction on or qualification of the use to be made of the fish, because it tends to their protection and conservation as much as does a limitation on the right to sell game or ship it to points without the state . . . the state has the right to limit or qualify the use that may be made of fish of the same species brought into the state from the high seas, in order to make effective the restriction on the use of fish taken from its own waters."

Section 1110 of the Fish and Game Code was considered in *Santa Cruz Oil Corp.* v. *Milnor,* 55 Cal.App.2d 56 [130 P.2d 256], and, in sustaining its requirements, the court adopted the following pertinent language from *Mirkovich* v. *Milnor,* 34 F.Supp. 409 : " 'That a state has the power to enact legislation for the conservation of its fisheries is, of course, not open to question. Any law having a reasonable relation to such object and its accomplishment, and which is not unduly oppressive upon individuals must be upheld as a legitimate exercise of the state's police power without inquiry into the possible soundness of legislative judgment in the premises and without consideration for possible individual hardships.

" 'The insurmountable difficulties attendant upon policing the waters of the state from the coast to the imaginary three mile limit, wherever fishing operations occur; the impossi-

bility of distinguishing fish taken in state waters from those taken from without, or between vessels fishing within from those fishing beyond the state's limits; the consequent ease with which fraud and deceit might be practiced by vessels delivering fish taken from the fisheries of the state to points outside the state on the pretext of operating solely beyond the three mile limit—these considerations alone justify the provisions of section 1110 of the Fish and Game Code as a proper exercise of the police power of the State of California, having reasonable relation to the object of their enactment, and reasonably calculated to render effective the state's power of control over the fish supply within its territorial waters.

" 'In *Bayside Fish Flour Co.* v. *Gentry, supra* [297 U.S. 422 (56 S.Ct. 513, 80 L.Ed. 772)], the United States Supreme Court upheld the constitutionality of certain portions of the California Fish and Game Code regulating the processing within the state, for interstate commerce, of sardines taken either from the waters of the state or from beyond the state's territorial boundaries. State legislation prohibiting the possession of wild game out of season within its borders was held a valid exercise by the state of its police power for the protection of the state's own game supply, in its application to game imported from without the state. . . .

" 'We have referred to but a few of the decisions upholding the constitutionality of state legislation calculated to effectuate the exercise by the state of its police power for the general welfare of its inhabitants. In each instance, the legislation was adjudged valid by application of the principle which governs the instant case; namely, that the state's power of control over its fish and wild game includes the right to adopt any measure, not unduly oppressive to private individuals, reasonably necessary to render that control effective.' "

▉▉▉▉ Applying the rule of these cases to Takahashi's situation, as the state may prohibit the transportation of salmon caught on the high seas through certain districts during a closed season (*Johnson* v. *Gentry, supra*); prohibit possession of game during a closed season even if brought from without the state (*Silz* v. *Hesterberg, supra*); prohibit the sale of trout within the state although it was lawfully caught in another state and brought into this state for the purpose of sale (*In re Deininger, supra*); or regulate the output of a plant processing fish caught on the high seas (*Van Camp Sea Food Co.* v. *Department of Natural Resources, supra*), in

furtherance of its declared public policy to prohibit ineligible aliens from taking its animals *ferae naturae,* the state also may refuse to issue a commercial fishing license to aliens ineligible to United States citizenship so as to permit them to bring ashore sea products at any point in the state for the purpose of selling the same in a fresh state. Section 990 of the Fish and Game Code as it stood at the time of the decision of *Abe* v. *Fish & Game Commission, supra,* required a license of every person who assisted in the bringing of fish caught on the high seas into this state, for the purpose of selling the same in a fresh condition, and limited the issuance of such license to persons who had continuously resided in the United States for a period of one year. The statute in that form rested upon no reasonable basis for the prohibition. The present provision prohibits the bringing of fish ashore in California in the furtherance of an established and legitimate policy in regard to the distribution and conservation of the common property of the state.

The original and amended judgments are, and each of them is, reversed with directions to enter judgment for the commission and its members.

Shenk, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The problem involved in this case is whether the state may by statute exclude aliens who are residents of the state from fishing in the waters thereof when all other persons are permitted to do so. Specifically, in the instant case, the statute not only discriminates against aliens solely upon the basis of alienage but goes further and excludes only certain classes of aliens, namely, those who are ineligible to citizenship. From a broader viewpoint, inasmuch as the fishing involved is commercial fishing, an age-old means of livelihood, the issue is whether an alien resident may be excluded from engaging in a gainful occupation—from working—making a living.

A mere statement of the problem should compel an answer favorable to the alien if there is any security in our constitutional guarantees. We must assume that the alien is in this country properly. The federal government has chosen to permit his entry and residence here. That course having been adopted, settled principles of constitutional law require that

the alien be accorded the right to work, engage in commerce and otherwise become a useful member of the crew who pulls his oar in the ship of state. There are several settled principles that must be remembered. The right to work—to earn a living—is secured' by the Constitutions, both federal and state. (*James* v. *Marinship Corp.*, 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900].) The equal protection principle of the Constitution shelters aliens as well as others. As said in *Truax* v. *Raich*, 239 U.S. 33, 39 [36 S.Ct. 7, 60 L.Ed. 131, Ann.Cas. 1917B 283, L.R.A. 1916D 545]: "The question then is whether the act assailed [a state statute requiring employers to employ a certain percentage of citizens in proportion to aliens] is repugnant to the Fourteenth Amendment. Upon the allegations of the bill, it must be assumed that the complainant, a native of Austria [an alien], has been admitted to the United States under the Federal law. He was thus admitted with the privilege of entering and abiding in the United States, and hence of entering and *abiding in any State in the Union.* (See *Gegiow* v. *Uhl, Commissioner,* decided October 25, 1915, *ante* p. 3 [36 S.Ct. 2, 60 L.Ed. 114].) *Being lawfully an inhabitant of Arizona, the complainant is entitled under the Fourteenth Amendment to the equal protection of its laws.* The description—'any person within its jurisdiction'—as it has frequently been held, includes aliens. 'These provisions,' said the Court in *Yick Wo* v. *Hopkins,* 118 U.S. 356, 369 [6 S.Ct. 1064, 30 L.Ed. 220] (referring to the due process and equal protection clauses of the amendment), 'are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.' See also *Wong Wing* v. *United States,* 163 U.S. 228, 242 [16 S.Ct. 977, 41 L.Ed. 140]; *United States* v. *Wong Kim Ark,* 169 U.S. 649, 695 [18 S.Ct. 456, 42 L.Ed. 890]. . . .

"It is sought to justify this act as an exercise of the power of the State to make reasonable classifications in legislating to promote the health, safety, morals and welfare of those within its jurisdiction. But this admitted authority, with the broad range of legislative discretion that it implies, *does not go so far as to make it possible for the State to deny to lawful inhabitants, because of their race or nationality, the ordinary means of earning a livelihood.* It requires no argument to show that the right to work for a living in the common

occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the amendment to secure. *Butchers' Union Co.* v. *Crescent City Co.,* 111 U.S. 746, 762 [4 S.Ct. 652, 28 L.Ed. 585] ; *Barbier* v. *Connolly,* 113 U.S. 27, 31 [5 S.Ct. 357, 28 L.Ed. 923] ; *Yick Wo.* v. *Hopkins, supra; Allgeyer* v. *Louisiana,* 165 U.S. 578, 589, 590 [17 St.Ct. 427], 41 L.Ed. 832] ; *Coppage* v. *Kansas,* 236 U.S. 1, 14 [35 S.Ct. 240, 59 L.Ed. 441]. If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words. It is no answer to say, as it is argued, that the act proceeds upon the assumption that 'the employment of aliens unless restrained was a peril to the public welfare.' The discrimination against aliens in the wide range of employments to which the act relates is made an end in itself and thus the authority to deny to aliens, upon the mere fact of their alienage, the right to obtain support in the ordinary fields of labor is necessarily involved. It must also be said that reasonable classification implies action consistent with the legitimate interests of the State, and it will not be disputed that these cannot be so broadly conceived as to bring them into hostility to exclusive Federal power. The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government. *Fong Yue Ting* v. *United States,* 149 U.S. 698, 713 [13 S.Ct. 1016, 37 L.Ed. 905]. The assertion of an authority to deny to aliens the opportunity to earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality.

"It is insisted that the act should be supported because it is not 'a total deprivation of the right of the alien to labor'; that is, the restriction is limited to those businesses in which more than five workers are employed, and to the ratio fixed. It is emphasized that the employer in any line of business who employs more than five workers may employ aliens to

the extent of 20 per cent of his employees. *But the fallacy of this argument at once appears. If the State is at liberty to treat the employment of aliens as in itself a peril requiring restraint regardless of kind or class of work, it cannot be denied that the authority exists to make its measures to that end effective.* Otis v. *Parker,* 187 U.S. 606 [23 S.Ct. 168, 47 L.Ed. 323] ; *Silz* v. *Hesterberg,* 211 U.S. 31 [29 S.Ct. 10, 53 L.Ed. 75] ; *Purity Co.* v. *Lynch,* 226 U.S. 192 [33 S.Ct. 44, 57 L.Ed. 184]. If the restriction to 20 per cent now imposed is maintainable the State undoubtedly has the power if it sees fit to make the percentage less. We have nothing before us to justify the limitation to 20 per cent save the judgment expressed in the enactment, and if that is sufficient, it is difficult to see why the apprehension and conviction thus evidenced would not be sufficient were the restriction extended so as to permit only 10 per cent of the employees to be aliens or even a less percentage, or were it made applicable to all businesses in which more than three workers were employed instead of applying to those employing more than five. We have frequently said that the legislature may recognize degrees of evil and adapt its legislation accordingly. (*Consolidated Coal Co.* v. *Illinois,* 185 U.S. 203, 207 [22 S.Ct. 616, 46 L.Ed. 872] ; *McLean* v. *Arkansas,* 211 U.S. 539, 551 [29 S.Ct. 206, 53 L.Ed. 315] ; *Miller* v. *Wilson,* 236 U.S. 373, 384 [35 S.Ct. 342, 59 L.Ed. 628] ) ; but underlying the classification is the authority to deal with that at which the legislation is aimed. The restriction now sought to be sustained is such as to suggest no limit to the State's power of excluding aliens from employment if the principles underlying the prohibition of the act is conceded. No special public interest with respect to any particular business is shown that could possibly be deemed to support the enactment, for as we have said, it relates to every sort. *The discrimination is against aliens as such in competition with citizens in the described range of enterprises and in our opinion it clearly falls under the condemnation of the fundamental law.''* [Emphasis added.] And the resident aliens are protected in their person and property. ''. . . aliens residing in the United States for a shorter or longer time, *are entitled,* so long as they are permitted by the government of the United States to remain in the country, *to the safeguards of the Constitution, and to the protection of the laws, in regard to their rights of person and of property,* and to their civil and criminal responsibil-

ity.'' [Emphasis added.] (*Fong Yue Ting* v. *United States*, 149 U.S. 698, 724 [13 S.Ct. 1016, 37 L.Ed. 905.) (See, also, *Terrace* v. *Thompson,* 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255].)

There is no reason why aliens ineligible to citizenship may be placed in a class by themselves, at least as long as they are residents of the state. The several states have no power to exclude aliens as such from their borders. (3 C.J.S. Aliens, § 33(c); 2 Am.Jur. Aliens, §§ 70, 73; Rottschaefer on Const. Law, p. 375.) Therefore, they cannot be excluded from residence here. Being required to accept them as inhabitants it must accord them the securities afforded others. The only basis for the classification suggested by the majority opinion is that, in furtherance of conservation of natural resources (fish and game), ''[Where] the legislature determines that some reduction in the number of persons eligible to hunt and fish is desirable, *it is logical and fair that aliens ineligible to citizenship shall be the first group to be denied the privilege of doing so.* This is a logical, established, and reasonable method of classifying for conservation purposes, and the existence of facts supporting the legislative judgment is presumed.'' [Emphasis added.] I can see no logic in depriving resident aliens, even though they are not eligible to citizenship, of the means of making a livelihood, including the pursuit of commercial fishing. They are lawfully inhabitants and residents of the state. Even if it be assumed that nonresidents, both alien and citizens of the United States, may be excluded from game and fish on the theory that such resources belong to the people of the state, the fact remains that resident aliens are a part of the people—the inhabitants and residents of this state. Because some believe that aliens should be punished by such a penalty is no basis for a reasonable classification. There is no sound basis for the argument that because the fish and game belong to the people of the state, the taking of them may be prohibited to all, and that with such a broad power any group of people may be arbitrarily excluded from the right to take any portion thereof. On the basis of that reasoning, the Legislature could validly prohibit persons ineligible to citizenship from using the highways. They belong to the state and the traffic hazards would be less if fewer people were using them. The same is true of the use of the parks, schools and other public buildings and

places. It could be argued that they are overcrowded and the more people using them, the greater the cost to the public, all to the diminishment of the resources of the state, natural or otherwise. While the state may withhold a privilege if it elects not to grant it, it cannot arbitrarily prevent any member of the public from exercising it while granting such privilege to others. To conclude otherwise would deprive the equal protection principle of all meaning. If aliens are to be given equal protection, and they must, then to put them all in a class by themselves is to refute the very premise of the doctrine. Manifestly, there is no rational basis for the classification. When the lack of a proper ground is patent on the face of legislation, proof of its lack of rationality is unnecessary. Suppose a statute declared that redheaded persons could not engage in certain occupations. Plainly, a redhead could not prove there was no possible reason why the public welfare is more jeopardized by having redheads than others in those callings. He would simply say all that anyone could say: ''That such a classification is pure nonsense,'' and there is not a court in the land that would not agree with him.

The denial to resident aliens of equal protection of the laws guaranteed other residents of the state has been accomplished by piecemeal methods. They have been denied the right to engage in first one occupation and then another. It cannot be doubted that a sweeping provision prohibiting them from engaging in any occupation whatsoever would be held invalid. (*Truax* v. *Raich, supra.*) The onslaught by the ''one at a time'' method is fast achieving the same sweeping result. (See 17 N.Y.Univ.L.Q.Rev. 242; 18 id., 483; 16 A.B.A.J. 113; 22 Minn.L.Rev. 137; 39 Cal.L.Rev. 1207.) One of the objectives of the Constitution of the United States, and particularly the amendments thereto, is to protect minorities. Section 1 of the Fourteenth Amendment to the Constitution of the United States provides that ''No state shall . . . deny to *any person* within its jurisdiction the equal protection of the laws.'' The words, ''any person,'' includes an alien. (*Truax* v. *Raich, supra.*) Any rational application of this provision to statutes such as the one here involved must result inevitably in striking down such statutes as being in clear contravention of this provision. To permit such a statute to stand is destructive of the fundamental concept upon which that provision is based.

Even if we assume that aliens as such may be excluded from some vocations or pursuits, yet *there is no conceivable basis for discrimination between different classes. of aliens.* In the instant case *not all aliens* are shut out of commercial fishing. It embraces only those "ineligible to citizenship." Other aliens may follow that enterprise. Thus we have at least one complete answer to the proposition that because the. fish are owned by the people of the state (people being used in the sense of a citizen of the state, and aliens are not citizens) all noncitizens may be excluded from taking the fish. That reasoning requires the exclusion of *all* aliens. It furnishes no justification for excluding some aliens and not others. The majority opinion suggests no possible basis for such a classification, and I do not believe there is any. Such a classification is based upon a mere *ipse dixit* and nothing more. The total absence of any rational foundation for such a classification is aptly illustrated by Dudley O. McGovney, professor of law, University of California, when he states: "Before stating with more precision the scope of rights denied to 'ineligible aliens' by these laws, let us look at their racial operation. Aliens of the brown or Malay race, except Filipinos of the same race, and aliens of the yellow or Mongolian race, except Chinese of the same race, are denied rights which aliens of the white or Caucasian race, aliens of the black or Negro race, and aliens of the red or American Indian race are permitted to enjoy without limitation. Thus eligibility of aliens to possess these particular rights follows a very queer pattern, or rather, is patternless, like a crazy quilt if they are Filipino aliens or Chinese aliens.

"There may also be some patches whose race or color is dubious. These are aliens. of races indigenous to British India, called Hindus in the popular parlance of Americans. When naturalization was confined to white and Negro aliens, the Supreme Court held that Hindus are neither, but surely they are not of the red, yellow, or brown races. Whatever their race, dark Hindu patches are included in the crazy quilt.

"The patternless craziness does not end there. Even an alien whose blood is seven-sixteenths Japanese or Korean may [enjoy equal protection of the laws] . . . if the other nine-sixteenths is wholly of the red, black, or white race, or Hindu, or Chinese, or Filipino, or a combination of any or all of these. So may any alien who is seven-sixteenths

Malay if the rest of his blood is wholly of a qualifying kind or a combination of qualifying kinds. The fraction of seven-sixteenths is taken as an example. The actual rule is that if eligible blood preponderates, however slightly, the alien is eligible to acquire real property in California. Here we have the possibility of patches of intermediate color. On the other hand, if Mongolian blood other than Chinese preponderates in the veins and arteries of an alien, or Malay blood other than Filipino predominates, that alien may not get into the quilt.'' (35 Cal.L.Rev. 7, 9.)

In applying the equal protection provision of the Fourteenth Amendment to aliens, the United States Supreme Court has drawn distinctions which, when applied to the instant statute, must render it invalid. Assuming the soundness of those distinctions for the sake of precedent alone, and applying them here, it appears that aliens may be shut out of the pool hall business (*Clarke* v. *Deckebach,* 274 U.S. 392 [47 S.Ct. 630, 71 L.Ed. 1115]), public employment (*Heim* v. *McCall,* 239 U.S. 173 [36 S.Ct. 78, 60 L.Ed. 206]), and the taking of game as a sportsman (*Patsone* v. *Pennsylvania,* 232 U.S. 138 [34 S.Ct. 281, 58 L.Ed. 539]). Those cases may be distinguished on various grounds: (1) In all of them the exclusion statutes under consideration included *all* aliens and not merely those ineligible to citizenship as is true of the statute here involved. (2) They did not concern the problem of a ''common employment'' from which the alien cannot be debarred. So says the United States Supreme Court in *Truax* v. *Raich, supra.* Commercial fishing, with which we are dealing, is a common pursuit with a long historical background. (3) The poolroom business (dealt with in the Clarke case) has long been the subject of especially severe regulation, and it was on that basis the court held the prohibition as to aliens valid, stating at page 397: ''The *admitted* allegations of the answer set up the harmful and vicious tendencies of public billiard and pool rooms, of which this Court took judicial notice in *Murphy* v. *California,* 225 U.S. 623 [32 S.Ct. 697, 56 L.Ed. 1229]. The regulation or even prohibition of the business is not forbidden. (Citation.) The present regulation presupposes that aliens in Cincinnati are not as well qualified as citizens to engage in this business.'' [Emphasis added.] The court stressed the proposition that aliens cannot be discriminated against upon an ''irrational'' basis. Clearly, there is no rational basis for a distinction be-

tween aliens who are eligible and those who are ineligible to citizenship. Such aliens when engaged in commercial fishing are not in a business intrinsically harmful to the public. (4) The public employment present in the Heim case was based upon the theory that the state may hire whom it pleases as its employees. This is clearly distinguishable from a state law forbidding a certain class of aliens from seeking a livelihood in a common occupation.

The cases holding valid alien land laws (see *Terrace* v. *Thompson,* 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255] ; *People* v. *Oyama,* 29 Cal.2d 164 [173 P.2d 794]), are expressly distinguished from the case at bar. In distinguishing *Truax* v. *Raich, supra,* the United States Supreme Court states in *Terrace* v. *Thompson, supra,* 221: "In the opinion [*Truax* v. *Raich*] it was pointed out that the legislation there in question *did not relate to the devolution of real property,* but that the *discrimination was imposed upon the conduct of ordinary private enterprise* covering the entire field of industry with the exception of enterprises that were relatively very small. It was said that the right to work for a living in the common occupations of the community is a part of the freedom which it was the purpose of the Fourteenth Amendment to secure.

"In the case before us, the *thing forbidden is very different.* It is not an opportunity to earn a living in *common occupations of the community,* but it is the privilege of owning or controlling agricultural land within the State. The quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the State itself." [Emphasis added.] Assuming the soundness of that distinction and the alien land law cases, here we have a common occupation or calling, "commercial fishing," and hence the Truax case controls. "Fishing was one of man's earliest sources of food supply and it is still one of his most important means of livelihood." (Encyclopedia of the Social Sciences, vol. III, p. 266.)

Finally, highly persuasive arguments may be made that the law in the instant case is aimed solely at Japanese in an obvious discrimination against a particular race, in spite of the fact that that race is not mentioned by name in the statute, by reason of the historical background of alien legislation and court decisions. (See 35 Cal.L.Rev. 7, 51.) It is

settled that such legislation is invalid. (See *Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] ; *Yu Cong Eng* v. *Trinidad,* 271 U.S. 500 [46 S.Ct. 619, 70 L.Ed 1059].)

In my opinion, the learned trial judge was right in granting petitioner a peremptory writ of mandate and the judgment should therefore be affirmed.

Gibson, C. J., and Traynor, J., concurred.